**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
Eastern Division**

| | |
|---|---|
| TRICIA FULLERTON, KARYN SLEPIAN, CLARIBEL GRAU, JAN SIMON, and KELLY CASHMORE, on behalf of themselves and all others similarly situated, | Civil Action No. 1:18-cv-4152 |
| Plaintiffs, | JURY TRIAL DEMANDED |
| vs. | |
| CORELLE BRANDS, LLC (previously d/b/a World Kitchen, LLC), CORELLE BRANDS HOLDINGS, INC. (previously d/b/a World Kitchen Holdings, Inc.), and CORNING INCORPORATED., | |
| Defendants. | |

| | |
|---|---|
| MARCIA SCHUTTE and MARTHA KLEIN, individually and on behalf of all others similarly situated, | Civil Action No. 1:18-cv-4198 |
| *Plaintiffs*, | JURY TRIAL DEMANDED |
| v. | |
| CORELLE BRANDS, LLC (previously d/b/a World Kitchen, LLC) and CORELLE BRANDS HOLDINGS, INC. (previously d/b/a World Kitchen Holdings, Inc.), and CORNING INCORPORATED, | |
| *Defendants*. | |

<u>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**</u>

Plaintiffs TRICIA FULLERTON, KARYN SLEPIAN, CLARIBEL GRAU, JAN SIMON,

KELLY CASHMORE, MARCIA SCHUTTE, and MARTHA KLEIN, on behalf of themselves

and all others similarly situated, through their undersigned counsel, bring this Consolidated

1

Amended Class Action Complaint ("CAC") against Defendant CORELLE BRANDS, LLC, previously doing business as World Kitchen, LLC, Defendant CORELLE BRANDS HOLDINGS, INC., previously doing business as World Kitchen Holdings, Inc. (together, "Corelle"), and Defendant CORNING INCORPORATED ("Corning") (Corelle and Corning are referred to herein collectively as "Defendants"). The following allegations are based upon personal knowledge as to Plaintiffs' own facts, upon investigation by Plaintiffs' counsel, and upon information and belief where facts are solely in the possession of Defendants.

## NATURE OF THE CASE

1.      This case arises from Defendants' betrayal of the public's trust in a well-known household brand name—Pyrex—by surreptitiously replacing the original Pyrex product with an inferior and unsafe product that unexpectedly shatters and injures consumers during ordinary use.

2.      Pyrex glassware has been a staple in American kitchens for more than a century. Originally developed in the early 1900s by Corning, a company that touts its expertise in materials science and innovation, Pyrex is currently manufactured, marketed, and sold by Corelle under a license from Corning.

3.      Together, Defendants Corelle and Corning have deceived consumers into believing that Pyrex glassware sold today is the same product that has "had a place in [the] hearts and homes [of consumers] for over 100 years" and "has been passed down from generation to generation,"[1] and that it remains the same "iconic, category-leading" product that has been a household name and "the vanguard in the housewares industry since the 19th century."[2]

---

[1] https://corellebrands.com/brands (last viewed Sept. 5, 2018).

[2] https://www.pwrnewmedia.com/2011/world_kitchen/pyrex/downloads/world_kitchen_fact_sheet.pdf (last viewed Sept. 5, 2018).

4.     A significant component of the Pyrex brand is its advertised and perceived ability to withstand substantial temperature changes that occur during routine household use. The first part of the Pyrex brand name, "*Pyr*," relates to the Greek word *pyro,* or fire, and refers to the high temperatures the glass can withstand. Pyrex's heat resistant qualities, and its ability to withstand extreme temperature changes, bolstered its reputation in American households.

5.     Well aware that the Pyrex name is a trusted household name, associated with quality, safety, and durability, Defendants identified and seized upon an opportunity to exploit the brand's reputation by replacing the original material used to make Pyrex glassware—borosilicate glass—with an inferior, unsuitable, unsafe and less expensive substitute—soda lime glass (the "Defect").  This change, concealed from consumers, turned Pyrex glassware from a safe, dependable product to a demonstrable hazard.

6.     When heated, Pyrex products manufactured from soda lime glass expand substantially more than Pyrex manufactured from borosilicate glass. This makes Pyrex products prone to an abrupt and unexpected failure—shattering. Shattering occurs because soda lime Pyrex cannot withstand nearly the same range of temperature changes as Pyrex manufactured from borosilicate glass.

7.     Defendants have and continue to mislead consumers into believing that soda lime Pyrex products are still safe for storing, heating, and serving food, when in fact they are not.[3]

8.     From the time that Defendants started making Pyrex out of soda lime glass, they failed to adequately disclose its defective nature. Instead, Defendants continue to advertise and market Pyrex in a manner intended to reinforce existing consumer perceptions about the quality

---

[3] "Heat-strengthened soda lime glass provides the same high-quality performance as borosilicate glass." https://pyrex.cmog.org/faq (last viewed Sept. 5, 2018).

and characteristics of the Pyrex brand—even though the product is now unfit and unsafe for normal household use. Defendants also inflate the prices for Pyrex products to reflect their claimed storage, heating, and serving capabilities.

9. Plaintiffs and putative Class Members unknowingly purchased Pyrex products that are of inferior quality and significantly less expensive to produce than borosilicate products. Further, Plaintiffs' and putative Class Members' Pyrex products all suffer from the Defect, which exists when the products are placed into the stream of commerce, posing the same substantial safety risk to Plaintiffs, Class Members, and the public at large.

10. Hundreds, if not thousands, of consumers have been seriously injured by shattering Pyrex, and those numbers will only increase as long as soda lime Pyrex products remain on the market.

11. In fact, a prominent retired Corning scientist, upon reading a scientific article highlighting the safety problems associated with Pyrex and other soda lime glass cookware, wrote to the author to say that the article "serves a very important purpose in publicising the criminal practise (in my mind at least) in selling cheap high expansion soda lime glass under the Pyrex name to the innocent public."[4]

12. As a direct and proximate result of: (1) the Defect and the inherent safety risks it creates, (2) Defendants' concealment of the Defect, (3) Defendants' misrepresentations and unfair and deceptive conduct relating to the Defect, (4) Defendants' failure to warn customers of the change in formulation and the Defect, (5) Defendants' failure to remove defective Pyrex from the stream of commerce, and (6) Defendants' failure to recall or remedy the Defect, Plaintiffs and

---

[4] Letter from Dr. Stanley Donald Stookey, inventor of CorningWare, to Dr. Richard Bradt (attached here as **Exhibit A**).

other similarly situated consumers (the "Class" or "Class Members") purchased and used Pyrex glassware when they either would not have made such purchases, or else would have paid significantly less for Pyrex glassware manufactured from soda lime glass.

## PARTIES

### Plaintiffs

13.     Plaintiff Tricia Fullerton is a resident and citizen of New York living in Brooklyn, Kings County, New York.

14.     Plaintiff Karyn Slepian is a resident and citizen of New York living in Dix Hills, Suffolk County, New York.

15.     Plaintiff Claribel Grau is a resident and citizen of Florida living in Tampa, Hillsborough County, Florida.

16.     Plaintiff Jan Simon is a resident and citizen of Michigan living in St. Johns, Clinton County, Michigan.

17.     Plaintiff Kelly Cashmore is a resident and citizen of Illinois living in McHenry, McHenry County, Illinois.

18.     Plaintiff Marcia Schutte is a resident and citizen of Ohio living in Cleves, Hamilton County, Ohio.

19.     Plaintiff Martha Klein is a resident and citizen of Massachusetts living in Ipswich, Essex County, Massachusetts.

### Defendant Corning

20.     Defendant Corning Inc. is a New York corporation with its principal place of business located at One Riverfront Plaza, Corning, New York 14831. Defendant Corning Inc. is a citizen of the State of New York.

5

21.     Defendant Corning Incorporated, was incorporated in New York in 1989 as a successor corporation to Corning Glass Works, which had been incorporated in New York in 1936.

22.     Defendant Corning is "one of the world's leading innovators in materials science," with "expertise in glass science, ceramics science, and optical physics, along with its deep manufacturing and engineering capabilities. . . . Corning's industry-leading products include damage-resistant cover glass for mobile devices; precision glass for advanced displays; optical fiber, wireless technologies, and connectivity solutions for state-of-the-art communications networks[.]"

23.     Defendant Corning continues to produce Pyrex-branded products for laboratory use, but no longer manufactures Pyrex glassware and bakeware for sale to consumers. It continues to hold the registered trademark for Pyrex and licenses the Pyrex name under a private licensing agreement to Defendant Corelle.

**Defendant Corelle**

24.     Defendant Corelle Brands, LLC is a Delaware limited liability company with its principal place of business located at 9525 West Bryn Mawr Avenue, Rosemont, Illinois 60018. Defendant Corelle Brands, LLC is citizen of the States of Delaware and Illinois.

25.     Defendant Corelle Brands Holdings, Inc. is a Delaware corporation with its principal place of business located at 9525 West Bryn Mawr Avenue, Rosemont, Illinois 60018. Corelle Brands Holdings, Inc. is a citizen of the States of Delaware and Illinois.

26.     Upon information and belief, the sole member and owner of Corelle Brands, LLC is Corelle Brands Holdings, Inc., a citizen of the States of Delaware and Illinois.

27.     Until approximately February 2018, Corelle Brands, LLC and Corelle Brands Holdings, Inc. were doing business as World Kitchen, LLC and World Kitchen Holdings, Inc.

(collectively "World Kitchen"), respectively. World Kitchen changed its name to Corelle Brands as "a key step in the company's growth and development."[5]

28.     The Corelle Defendants design and manufacture and market cookware, bakeware, tabletop products and cutlery sold under well-known brands including CorningWare, Pyrex, Corelle, Chicago Cutlery, Snapware, and OLFA. Corelle employs approximately 3,000 people and has major manufacturing and distribution operations in the United States, Canada, and Asia-Pacific regions.

29.     Corelle designs, manufactures, markets, and sells Pyrex products under a license issued by Corning in approximately 1998.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because: (1) there are one hundred or more (named or unnamed) class members, (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (3) there is minimal diversity because at least one Plaintiff and Defendants are citizens of different states. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

31.     This Court may exercise jurisdiction over the Corelle Defendants because they are citizens of this State and District and maintain their principal places of business in this District, they have continuous and systematic contacts with this District, they do substantial business in this State and within this District, receive substantial revenues from their marketing, distribution, and sales of Pyrex glassware in this District, and have engaged in the unlawful practices described

---

[5] https://www.pwrnewmedia.com/2011/world_kitchen/pyrex/downloads/world_kitchen_fact_ sheet.pdf (last viewed Sept. 5, 2018); http://www.prnewswire.com/news-releases/world-kitchen-changes-name-to-corelle-brands-300593135.html (last viewed June 14, 2018).

in this Complaint in this District, so as to subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

32.     This Court may exercise jurisdiction over Corning because it has continuous and systematic contacts with this District and does substantial business in this State and within this District, and because its continuing involvement with Pyrex, including but not limited to licensing the trademarked Pyrex name for use on products for sale in this District, profiting from the sale of defective Pyrex to consumers in this District who have been unfairly and deceptively led to believe that Pyrex has qualities it does not have, and executing the licensing agreement with a resident of this District, provide the minimum contacts necessary to establish jurisdiction over Corning.

33.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391 because Corelle is headquartered in this District, has advertised in this District, and has received substantial revenues and profits from the sales of Pyrex which it has directed into the stream of commerce in this District, and, upon information and belief, it executed its licensing agreement with Corning in this District; therefore, a substantial part of the events or omissions giving rise to the claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### A.     The Original Borosilicate Pyrex

34.     Pyrex was the first branded product manufactured by Corning's Consumer Products Division.[6]  Beginning in the early 1900s, the original Pyrex was manufactured from borosilicate

---

[6] https://www.cmog.org/article/pyrex (last viewed Sept. 5, 2018).

glass. Corning built the brand's reputation by manufacturing Pyrex from borosilicate glass for decades.

35.     The Pyrex brand was born from a discovery by one of Corning's scientists, Jesse Littleton.  After a casserole dish cracked, his wife, Bessie Littleton, asked him if the temperature-resistant glass he was evaluating for railroad lanterns and battery jars could be used for baking. He created a makeshift dish with the borosilicate glass, and Bessie successfully baked a cake with it. From this discovery, Defendant Corning launched Pyrex, the first consumer cooking products made with temperature-resistant glass.[7]

36.     In its original patent application, dated May 27, 1919, Corning stated that its culinary products would be made of borosilicate glass due to its high coefficient of thermal endurance, and noted it was "desirable" for its culinary glass products to have the "power to undergo sudden cooling without fracture."

37.     Indeed, because Pyrex products made of borosilicate glass were strong and could withstand the substantial temperature changes that occur during normal household use, Pyrex products earned the trust of generations of American consumers, who reasonably believed that they could safely use Pyrex for normal household cooking.

**B.**     **Defendants' Shift to Cheaper and Inferior Soda Lime Pyrex**

38.     Starting several decades ago,[8] Corning began manufacturing Pyrex from soda lime glass instead of borosilicate glass. Today, Corelle continues to manufacture Pyrex from soda lime glass, under a licensing agreement with Corning.

---

[7] *See* https://www.smithsonianmag.com/innovation/how-pyrex-reinvented-glass-new-age-180955513 (last viewed Sept. 5, 2018).

[8] Publicly available information regarding the precise timing of the change in materials is conflicting. The details of the shift from borosilicate glass to soda lime glass, and ways to distinguish the two products, will be the subject of discovery.

39.     Corning made the change because it realized that it could produce Pyrex from soda lime glass, which would look just like Pyrex made from borosilicate glass, but would allow a much greater profit margin—particularly if consumers did not know or understand the difference between the two formulations.

40.     Soda lime glassware is significantly less expensive to produce than borosilicate products because both raw material and energy costs are substantially lower.[9] Unfortunately for unsuspecting consumers, a significant reduction in quality and safety accompanies this reduction in costs.

41.     Corning made the change from borosilicate glass to soda lime glass without retooling the design to make it more appropriate for the new material, without informing consumers of the change, and without giving consumers adequate notice of the resulting dangers.

### C.     The Dangers of Soda Lime Pyrex

42.     Borosilicate glass is a superior material for bakeware because, as noted, it has a low coefficient of thermal expansion, meaning that it does not expand much when it is heated, even to high temperatures. This makes borosilicate glass very resistant to thermal shock and allows an increased maximum change in surface temperature without cracking, breaking, shattering, or exploding.[10] Borosilicate glass is also mechanically strong and can withstand the rigors of normal household kitchen use without breaking.

---

[9] Corning has acknowledged the cost of borosilicate glass, in comparison to soda lime glass, referring to "the increased cost for [borosilicate] materials" as a "definite handicap." https://patents.google.com/patent/US2224493 (last viewed Sept. 5, 2018).

[10] T.J. Liu & N.A. Fleck, *The Thermal Shock Resistance of Solids*, 46 Acta Materialia 4755, 4755 (1998); *Transparent Materials Comparison*, Rayotek Scientific, Inc., https://rayotek.com/tech-specs/material-comparisons.htm (last viewed Sept. 5, 2018).

43.     In contrast, soda lime glass can and regularly does shatter unexpectedly during the course of normal household kitchen use, often sending pieces of sharp glass flying through the air.

44.     This is because soda lime glass, which is the cheapest form of commercial glass to produce[11] has a very high coefficient of thermal expansion[12] and very poor thermal shock resistance.[13] When heated, soda lime glass expands substantially more than borosilicate glass.

45.     Accordingly, soda lime glass is much more prone to cracking, breaking, shattering, or exploding when exposed to rapid changes in temperature.[14] Stated another way, borosilicate glass is "stronger and harder than soda lime glass."[15]

46.     In fact, in a separate patent application, Corning noted that the "thermal stability [of soda lime glass] sometimes leaves something to be desired."[16]

47.     Unfortunately for consumers, not only is brand new Pyrex made of soda lime glass more susceptible to shattering than brand new Pyrex made of borosilicate glass, but that susceptibility increases over time with normal household use.

---

[11] https://www.cmog.org/article/types-glass (last viewed Sept. 5, 2018).

[12] *Borosilicate Glass vs. Soda Lime Glass?* Rayotek Scientific, Inc., https://rayotek.com/wpnews/borosilicate-glass-vs-soda-lime-glass (last viewed Sept. 5, 2018).

[13] *Supra*, *Transparent Materials Comparison*; "However, such [soda lime] glasses are generally characterized by a relatively high thermal coefficient of expansion. Hence, they have a low resistance to heat shock, unless physically strengthened as by air tempering." https://patents.google.com/patent/US4337295.

[14] *Supra*, *Borosilicate Glass vs. Soda Lime Glass?*.

[15] *Supra*, *Transparent Materials Comparison*.

[16] https://patents.google.com/patent/US6063718.

48.     Like any glassware, Pyrex will be subject to scratching, chipping, and other minor damage through normal and expected use, cleaning, and storage. This is unavoidable on the part of the consumer and is or should be anticipated by Defendants.

49.     With original borosilicate Pyrex, normal wear and tear was of less concern because that product had virtually no coefficient of thermal expansion and thus had a significantly lower risk of thermal shock failure than soda lime Pyrex.

50.     Because soda lime Pyrex has a much greater coefficient of thermal expansion, it must be tempered, or heat strengthened, in order to increase its thermal shock resistance.

51.     Tempering, however, is not a solution to the problems associated with soda lime glass.  Rather, tempering exacerbates the problems associated with soda lime glass.

52.     Tempering strengthens annealed soda lime glass by increasing the amount of surface compression. Damaging the surface, however, reduces the amount of tension necessary to cause the glass to fail. So with every nick, scratch, or chip—even those not easily detectible—a soda lime Pyrex product becomes more likely to shatter from changes in temperature.

53.     Defendants knew or should have known that glassware sustains minor damage in normal and expected use, making tempered soda lime Pyrex much more susceptible to thermal shock failure than borosilicate Pyrex.

54.     Tempering not only makes soda lime Pyrex more likely to shatter, but it makes Pyrex more dangerous when it does shatter as a result of thermal shock. This is because Defendants' tempering process creates internal tension in each Pyrex product. When Pyrex shatters due to thermal shock (which often happens while it is sitting on a flat surface), that internal tension sends shards of glass flying through the air.  Thus, as a result of the tempering process, soda lime Pyrex products don't simply crack—they explode.

12

55.     By contrast, the original borosilicate Pyrex products, which did not require heat strengthening, were "annealed," or essentially free of internal tension. Unlike soda lime Pyrex, borosilicate Pyrex sends glass shards flying through the air only when it is dropped (and dropping, unlike shattering from changes in temperature associated with normal household use, is a risk understood by most consumers).

56.     In theory, heat strengthening, or thermal tempering, could provide the additional benefit of causing Class Pyrex Products that do break to shatter in a much safer manner, known as "dicing." Dicing is the process that occurs when glass shatters into small relatively uniform and relatively harmless cubes. Dicing is seen, for example, when tempered automobile glass fractures into small fragments, and consumers expect "tempered" glass to break in that manner.

57.     However, as discussed in more detail below, the authors of a scientific article analyzed modern soda lime glass cookware, including Pyrex, using several methods, and concluded that although the soda lime glass cookware had been heat-strengthened to some degree, in actuality the heat strengthening neither: (1) substantially increased the products' ability to withstand temperature change, nor (2) made the glassware safer by causing it to dice into small, relatively uniform cubes.

58.     In sum, Defendants chose to partially temper soda lime Pyrex glassware knowing that doing so: (1) not only would not properly protect against thermal shock failure, but would actually increase the risk of such failure over time with normal use;  (2) would not prevent large, sharp shards of glass—which risk severe lacerations to consumers—from forming upon failure; and (3) would create internal tension that can cause those sharp shards to fly through the air with potentially devastating results.

**D.**     **Scientific Research Confirms the Danger and Inferiority of Soda Lime Glass**

59.     Various studies have demonstrated the significant differences in thermal endurance and resistance to temperature change between borosilicate glass and soda lime glass. For example, Dr. Richard Bradt, a materials scientist and professor emeritus at the University of Alabama whose expertise includes glass, conducted an independent experiment to determine the thermal shock resistance of pure soda lime glass, when compared to borosilicate glass. Dr. Bradt's findings demonstrated that borosilicate glass can withstand a 333-degree Fahrenheit change in temperature before fracturing while soda lime glass can withstand a temperature change of only 99 degrees Fahrenheit before fracturing.[17]

60.     In 2012, Corelle (formerly World Kitchen) attempted to discredit the findings of Dr. Bradt and his colleagues in a lawsuit where Corelle unsuccessfully argued that Dr. Bradt's findings were false, deceptive, and misleading to consumers. The court ruled in favor of Dr. Bradt, finding no admissible evidence refuting his findings. *World Kitchen, LLC v. The American Ceramic Society, et al.*, Case No. 12-cv-8626, 2016 U.S. Dist. LEXIS 85717, at *20 (N.D. Ill. June 30, 2016).[18]

61.     Corelle continued its attempt to discredit the findings of Dr. Bradt's study and similar studies on its website in a section called "The Truth About Pyrex." The stated purpose of that particular section is that Corelle "want[s] you to know about reports mischaracterizing and

_____

[17] R.C. Bradt & R.L. Martens, *Shattering glass cookware*, American Ceramic Society, Sept. 2012, at 33 (attached as **Exhibit B**).

[18] Order, ECF No. 259, *World Kitchen, LLC v. The American Ceramic Society, et al.*, No. 1:12-cv-08626 (N.D. Ill. June 30, 2016) (attached as **Exhibit C**). Corelle appealed the court's judgment but later voluntarily dismissed its appeal. *World Kitchen, LLC v. Bradt*, No. 19-3082, 2017 U.S. App. LEXIS 15391 (7th Cir. Feb. 28, 2017).

wrongly disparaging the reliability, durability and excellent safety record of American-made glass cookware made from heat-strengthened soda lime glass."[19]

62.     Notwithstanding Corelle's representations, hundreds, if not thousands, of consumers have been seriously injured by shattering soda lime Pyrex, and those numbers will only increase as long as soda lime Pyrex products continue to be sold and used in household kitchens.

**E.     Defendants' Uniform and Widespread Marketing and Sale of Pyrex**

63.     Defendants market Pyrex[20] directly to consumers throughout the United States, including through the website https://www.pyrexware.com, which offers the "largest selection of Pyrex® products"[21] and the website https://www.corningware.com. Defendants also sell Pyrex products through leading retailers in the United States, such as Target, Bed Bath & Beyond, grocery stores, local retailers, and through on-line retailers like Amazon.com.

64.     Corning initially marketed Pyrex as "ice-box to oven" and "oven to ice-box," and Defendants have carefully cultivated and perpetuated the consumer perception that Pyrex can withstand any change in temperature associated with normal household cooking and freezing, even after transitioning from borosilicate glass to soda lime glass.

65.     During more than a century of advertising, Defendants' message has remained clear and unchanged, despite the change in materials. In fact, the Corning Museum of Glass, which was established by Corning on the company's 100th anniversary, recently celebrated "A CENTURY OF PYREX," noting: "Pyrex has become an icon in most American homes, in the forms of clear

---

[19] World Kitchen, LLC, *The Truth About Pyrex* (attached as **Exhibit D**).

[20] Corelle currently manufactures and markets Pyrex, and the licensing agreement may give Corning control over some of those functions, as well.  Corning's current involvement in the manufacturing and marketing of Pyrex will be the subject of discovery.

[21] https://www.shopworldkitchen.com/pyrex (last viewed Sept. 5, 2018).

borosilicate bakeware, sets of patterned opal ware, and stovetop FLAMEWARE. Layered into the history of the Pyrex brand are the personal histories of families and individuals who have used, loved, gifted, and collected America's favorite dish over the last 100 years."[22]

66.     In 1915, an advertisement announcing, "Bake in a glass!" appeared in *Good Housekeeping*, informing consumers that Corning had created a product that allowed food to be mixed, baked, and served all in the same dish. Just a few years later, by 1919, four million pieces of Pyrex glassware, made of borosilicate glass, had been sold to customers throughout the United States.[23]

67.     Defendants continue to market Pyrex products as "versatile" glassware that is "safe to use in the oven, microwave, refrigerator, freezer and dishwasher." Through its license with Corning, Corelle advertises Pyrex products on its website as versatile and intended for use in a variety of temperatures:

> Versatility makes it easier for you with these cook-and-serve in one dishes that go from the oven to the table. Use them for dry or refrigerated storage and microwave reheating and enjoy maximum functionality with minimal mess.[24]

> Dishwasher, refrigerator, microwave & pre-heated oven safe.[25]

---

[22] https://www.cmog.org/article/pyrex (last viewed Sept. 5, 2018).

[23]    https://www.npr.org/sections/thesalt/2017/07/25/538527917/does-your-familys-century-old-pyrex-still-rule-the-kitchen (last viewed Sept. 5, 2018). Another advertisement from 1937 announced "From oven . . . to table . . . to refrigerator – in the same sparkling Pyrex Oval Baker." http://www.pyrexcollector.com/ads.php. Likewise, an advertisement from 1948 announced "Bake Serve and Store in the same Pyrex dish." *Id.*

[24] http://www.pyrexware.com/easy-grab-4-pc-oblong-baking-dish-set/1090992.html#start=8 (last viewed Sept. 5, 2018).

[25]    http://www.pyrexware.com/4.5-qt-oblong-baking-dish/5302470.html#start=2    (last    viewed Sept. 5, 2018).

68.     These claims reinforce existing consumer perceptions about the durability and safety of Pyrex, even though the durability and safety are no longer the same.

69.     These assertions are false, misleading, unfair, and deceptive because the Pyrex glassware sold to Plaintiffs and Class Members is inherently dangerous due to the Defect which renders it likely to shatter during normal household kitchen use.

70.     Defendants failed to disclose the Defect to consumers at any time before, during or after purchase.

71.     In Europe, where Pyrex is still made of borosilicate glass under a separate license from Corning, the products for sale are advertised as being made of "[t]empered borosilicate glass, *the best glass for oven safe cooking*."   European Pyrex products are also advertised as being "thermal shock resistant," such that they can go "straight from the oven to the table . . . from the table to the refrigerator . . . from the refrigerator to the oven . . . ," a belief that American consumers continue to hold as a result of Defendants' failure to disclose the shift in materials from borosilicate glass to inferior soda lime glass.[26]

   **F.     Defendant's Longstanding Knowledge of the Defect**

72.     Defendants knew or should have known when they marketed and sold Pyrex to the public that Pyrex suffered from the Defect, which creates an unreasonable risk that Pyrex will crack, break, shatter, or explode when used as advertised. These risks include significant personal injury and/or property damage to consumers, as well as the destruction of the product itself during its useful life.

---

[26] https://www.pyrexuk.com/products/roasters/square-roaster-29x23cm.html (last viewed Sept. 5, 2018); https://www.pyrexuk.com/materials/borosilicate-glass.html (last viewed Sept. 5, 2018) (emphasis added).

73.     Defendants' knowledge is established through civil lawsuits filed by or against Corelle (previously doing business as World Kitchen, LLC) and, upon information and belief, against Corning, pertaining to heat-tempered soda lime glass Pyrex products.

74.     Defendants' knowledge is further established through numerous online postings complaining that Pyrex glassware failed during normal use.

75.     Defendants' knowledge is even further established through published articles written about Pyrex glassware and the inferior quality of the soda lime glass used in the product. As noted, in approximately September 2012, the American Ceramics Society published an article entitled "Shattering glass cookware," which concluded that Defendants' reformulation of Pyrex products from borosilicate glass to soda lime glass reduced the products' "thermal stress resistance," making them vulnerable to "sudden, explosion-like failure." R.C. Bradt and R.L. Martens, "Shattering glass cookware," *Am. Ceramic Soc'y Bull.* (Sept. 2012) (hereinafter, "American Ceramics Society article"), at 33. The American Ceramics Society article also reveals that "documented reports of incidents of dramatic shattering failures during what most kitchen cooks would consider normal use suggests that the margin of safety for avoiding thermal stress failures of soda lime silicate cookware is borderline. It does not appear to be adequate for all household cooking." *Id.* at 37.

76.     The authors of the American Ceramics Society article analyzed modern soda lime glass cookware, including Pyrex, using several methods, including observation of the long, sharp shards produced when those products shatter.  The American Ceramics Society article authors concluded that, although the soda lime glass cookware had been heat-strengthened to some degree, in actuality the heat strengthening neither (1) substantially increased the products' ability to

withstand temperature change, nor (2) made the glassware safer by causing it to break into small, relatively uniform cubes (a process known as "dicing").

77.     In the words of the authors, the heat strengthening "does not appear to be sufficient to increase substantially the thermal stress fracture resistance of the cookware, nor is it sufficient to create a desirable dicing fracture pattern[.]"

78.     The Corelle Defendants are well aware of the American Ceramics Society article, given that they sued the authors under a variety of theories, and lost on all claims following a bench trial in this Court. *World Kitchen, LLC v. American Ceramic Soc'y, et al.,* Case No. 12-cv-8626, 2016 WL 3568723 (N.D. Ill. June 30, 2016). Defendants' indisputable knowledge of the significant difference in thermal shock resistance between borosilicate Pyrex and heat-tempered soda lime Pyrex is evidenced by their unsuccessful lawsuit which failed to prove any deception by Dr. Bradt or his research colleagues.[27]

79.     Defendants' actual knowledge of the Defect is also demonstrated by the section of their website entitled "The Truth About Pyrex"[28] wherein they continue to attempt to discredit findings that their soda lime glassware has a significantly lower thermal shock resistance than borosilicate glassware. Not only have Defendants been aware of the Defect, they actively attempt to conceal it from consumers through this website section.

80.     Further, various incidents of shattered Pyrex glassware have appeared in the media, including the website of Clark Howard, a popular consumer expert and host of the nationally-syndicated *Clark Howard Show*, whose family experienced a "loud explosion" during a family

---

[27] *Supra*, ¶ 55.

[28] *Supra*, n.20 (attached as **Exhibit D**).

dinner when a brand new Pyrex casserole dish exploded,[29] and in YouTube postings by consumers.[30]

81.     Customer complaints reported to the Consumer Product Safety Commission are also indicative of the scope of this Defect, and further demonstrate that Defendants either knew or should have known of its existence. These complaints, available online,[31] all relate to Pyrex glassware, with some complaints being posted as far back as 2011 and others as recently as the end of 2017:

    a.    (In November, 2017) I was baking yams in the largest pan. After I took the pan out of the oven and set it on top of the oven, it exploded. Shards of glass scattered all over the kitchen, as far as seven feet away. I am very lucky that I wasn't hurt and especially lucky that a shard of glass didn't end up in my eye! I used the product the way it is supposed to be used.[32]

    b.    On July 15, 2017, I had an alarming and dangerous incident. I cooked a salmon patty in my Pyrex Glassware dish at 450 degrees for 15 minutes. I removed the dish from the oven, and before I had the chance to put it down, the glassware violently exploded in my hand, sending shards of glass flying toward my face and throughout my kitchen and the adjoining hallway.[33]

    c.    My stove, countertop, kitchen floor, hallway floor were covered in large pieces of shattered glass and small shards of it, everywhere. Fortunately, I was wearing my reading glasses, which I believe protected my eyes from injury.[34]

---

[29] https://clark.com/family-lifestyle/pyrex-dish-explodes-clark-howard-kitchen (last viewed Sept. 5, 2018).

[30] *See, e.g.,* "Exploding Pyrex!" https://www.youtube.com/watch?v=W91fOFLhHLI on August 27, 2017 (last viewed Sept. 5, 2018) (posted by Barry Zoeller); "Pyrex glass pan exploding in my kitchen…," https://www.youtube.com/watch?v=ufMkWrVRwf0 on Oct. 26, 2016 (last viewed Sept. 5, 2018) (posted by Danny Maiorani).

[31] SaferProducts.gov, http://www.saferproducts.gov/Default.aspx (last viewed Sept. 5, 2018).

[32] https://www.saferproducts.gov/ViewIncident/1712059 (last viewed Sept. 5, 2018).

[33] https://www.saferproducts.gov/ViewIncident/1679597 (last viewed Sept. 5, 2018).

[34] https://www.saferproducts.gov/ViewIncident/1627314 (last viewed Sept. 5, 2018).

d.  My Pyrex brand glass baking dish shattered spontaneously while sitting in a drawer overnight. While the drawer contained the damage somewhat, chunks of glass sprayed throughout the drawer, ricocheting throughout the cabinet. If this had occurred on a counter, there would have been serious risk.[35]

e.  At 1:20am I heard a crashing sound. Upon looking nothing was evident. Later the same day I opened a lower kitchen cabinet and glass spilled everywhere slivers and shards. My 9 x 13 glass Pyrex baking dish exploded on the shelf in the middle of the night! It hadn't been used for weeks and had no damage. I researched and found this is not an uncommon problem. Why is it still being manufactured?[36]

f.  The consumer stated that she placed the dish, which contained broccoli and olive oil, in a preheated 375-degree oven. About four minutes later, she heard a pop. She went to the oven and saw that the glass dish had shattered. The contents had spilled and cause a fire in the oven. The consumer turned the oven off and got a fire extinguisher to put the fire out.[37]

g.  My 9x13 Pyrex dish exploded 10/8/17 when I attempted to take it out of our dishwasher. It had run its cycle the night before and was no longer hot, my dish had a handle on edge and I just grabbed it and pulled and immediately it exploded shards everywhere spanning a 3-5 foot radius. I screamed for my husband to secure dogs and kids and clean me a way out as I was barefoot and my right arm had 6 bleeding spots and my left hand had a shard centered in the middle superficially but painful.[38]

h.  (In September of 2017), I put a large Pyrex measuring cup in my microwave with some stew in it, heated it for less than three minutes, and it shattered when i tried to take it out, burning my hand.[39]

i.  (In April of 2011) when taking a Pyrex 9x12 baking dish from the oven, it actually blew up in my wife's hands. The dish had been in the oven for 15 minutes at 400 degrees. It contained 4 pieces of baked fish that had marinated for 20 minutes in the refrigerator. The explosion was so violent

---

[35] https://www.saferproducts.gov/ViewIncident/1627314 (last viewed Sept. 5, 2018).

[36] https://www.saferproducts.gov/ViewIncident/1698622 (last viewed Sept. 5, 2018).

[37] https://www.saferproducts.gov/ViewIncident/1484232 (last viewed Sept. 5, 2018).

[38] https://www.saferproducts.gov/ViewIncident/1703644 (last viewed Sept. 5, 2018).

[39] https://www.saferproducts.gov/ViewIncident/1691194 (last viewed Sept. 5, 2018).

that we found pieces of glass over 40 feet away. The dish shattered into thousands of small pieces. There were very few pieces over 6 inches long. My wife was wearing jeans and closed shoes. She did not get injured even though she was hit with many, many pieces of shrapnel. It took over two hours to clean up the mess off of cabinets, appliances, counter tops, and the floor.[40]

j.     I made lasagna this past weekend (Friday, April 15, 2011) in a Pyrex 9x13 glass baking dish. I only baked it at 350 F for about 30 minutes. When I took it out of the oven and set it on my stove top, the 9x13 glass baking dish exploded. It cut myself and my fiancé, who was approximately 2 feet away from the pan.[41]

k.     (In May of 2011) I was cooking a (half) rack of lamb in a light wine sauce in an 11x13 glass Pyrex dish @ 425 degrees (in a preheated oven) for 15 minutes (not long in my opinion). I removed it from the oven, closed the oven door and it EXPLODED in my hand. Burning hot glass shards and liquids from the lamb and wine marinade went down my shirt and burned and cut me. It sounded just like a small bomb went off and it exploded into a million pieces sending shards in a 6 foot direction. We determined that it indeed was one of our "newer" Pyrex made out of the soda lime glass. Quite frankly, I will never put Pyrex in the oven AGAIN, even at 350 degrees, we believe that it is an unstable product even when the product directions are followed.[42]

l.     was baking a pork roast for dinner on 6/14/11 at 2:00 pm in the afternoon. roast had been in a preheated oven for approximately 1 hr. I was in living room watching a movie when I heard a loud bang come from the kitchen, when I went to kitchen saw nothing out of ordinary decided to check on roast when I opened door of oven, the Pyrex 13x9 baking pan the roast was in had exploded and shards of glass covered the inside of my oven and in my roast. ruined my roast and my pan had to throw dinner away and took me 2 hrs. and a few burns later finally cleaned up the mess.[43]

m.     On October 16, 2011 about 6:30 pm CST I was cooking marinated portobella mushrooms in my oven that was placed in a Pyrex dish. They had been marinated, then placed in the oven second row down and broiled on the lowest setting. I added cheese to the portobellas and then after approximately

---

[40] https://www.saferproducts.gov/ViewIncident/1174137 (last viewed Sept. 5, 2018).

[41] https://www.saferproducts.gov/ViewIncident/1178095 (last viewed Sept. 5, 2018).

[42] https://www.saferproducts.gov/ViewIncident/1178301 (last viewed Sept. 5, 2018).

[43] https://www.saferproducts.gov/ViewIncident/1187336 (last viewed Sept. 5, 2018).

3 minutes I took them out and placed them on some hot pads. The PYREX dish, that I had cooked them in, exploded in to several hundred small shards. The explosion was so violent that it spread out to about 100 feet, caused me to have about 7 nicks on my leg area, burns on my legs, and several tiles on my floor have melted spots on them from the incident. As of now I have not received any medical attention to my injuries.[44]

82. Additional consumer complaints, found on various websites, are consistent with the complaints to the Consumer Product Safety Commission:

a. [one-star rating] My dinner was cooking in a Pyrex glassware and it exploded in my face. Luckily I was ok but my oven is destroyed and glass is all over the kitchen. Luckily no huge fire but it's very dangerous. Needs to be recalled asap.[45]

b. [one-star rating] I had a glass pyrex bowl with lid that I loved and used frequently for storage in the refrigerator. This past week I was washing dishes and put the bowl (at room temperature, it had been emptied hours earlier) in my dishwater. As I was washing another dish, the Pyrex bowl shattered into hundreds of pieces in my dishwater!! I received a few small cuts, but it could have been a lot worse! I grew up believing Pyrex was the best, so this came as a shock... Came online looking for a warranty and found that I am not alone in having exploding Pyrex. So disappointing! I have the bowl in another container should Pyrex question my veracity.[46]

c. [one-star rating] I have had 2 glass 13 x 9 pans explode in the oven. I always have loved Pyrex but now I refuse to buy any more of them or Pyrex of any kind, I stick to metal. One pan had a beautiful roast with potatoes and vegetables. The other had chicken enchiladas, both these pans exploded and of course I had to toss the food out. Very disappointed in Pyrex, no more for me!!![47]

d. [one-star rating]. I bought three of these dishes in mid December 2017, to use for entertaining my family over the holidays. The second time I used my new Pyrex dish was to reheat our regular sweet corn casserole

---

[44] https://www.saferproducts.gov/ViewIncident/1208318 (last viewed Sept. 5, 2018).

[45] Posted by Catherine of Mount Laurel, NJ, at https://www.consumeraffairs.com/homeowners/pyrex.html, on April 15, 2018 (last viewed Sept. 5, 2018).

[46] Posted by Denise of Mcgraw, NY, at *id.*, on Mar. 25, 2018.

[47] Posted by Kathleen of Folsom, CA, at *id.*, on Mar. 8, 2018.

the day after Christmas. I reheated it as normal and laid it gently on my stove top. Within moments, the dish literally exploded all over my kitchen. I was injured, but thankfully, not badly. Needless to say the dish could not be eaten and I have been afraid to use the additional two dishes I purchased since.[48]

e.  [one star-rating] **Exploded while Microwaving.** I have had these [Pyrex Simply Store 10-piece glass food storage set] for a while and I mostly use them to store food in the fridge. When I first started using it for microwaving purposes, the plastic lid melted on the edge and had not been able to close properly. Tonight, when I put one of the smaller bowls (taken out from a cabinet under room temperature - it was not even taken out from the fridge) in the microwave for a minute and half to heat up some sesame seeds, the glass container exploded into pieces with a loud bang! Luckily, my microwave door did not spring open or it would have been really bad. When I opened the microwave door, some tiny pieces of glass fell on the counter and into the bowls that are on the counter and have my prepped dinner ingredients. I did not know there was glass pieces in my prepped food until I chewed on them! Luckily, they were small enough and there was no major injury. I immediately threw my dinner away. It also took me some time to clean up the mess in the kitchen.[49]

f.  I was cooking a roast last night using a pyrex baking dish. The temperature was set on 180 degrees, which I've done hundreds of times before. Whilst baking the dish shattered, I could not salvage the food, glass was all through it. I'm very disappointed in the product. Everything had to be thrown away. Not to mention the time it took to get rid of all the glass and oil. I would like to be compensated in some way for this.[50]

g.  I open a can of soup put soup in a Pyrex bowl and placed in microwave for 2 min. Removed bowl and was on about the 4th spoon of soup when I felt some thing sharp in my mouth upon spiting it out to examine I seen a piece of white glass so compared I to the chip on edge of bowl I got a ziplock bag placed the soup and placed broke pieces and the bowl bottom fell off the already badly broken bowl so I am now going to the ER to be sure I have

---

[48] Posted by Caroline of Fort Meyers, FL, at *id.*, on Feb. 16, 2018.

[49] Posted by Snala, at https://www.amazon.com/Pyrex-Simply-Store-10-Piece-Storage/product-reviews/B00005B8K5/ref=cm_cr_arp_d_hist_1?filterByStar=one_star&pageNumber=1, on Mar. 2, 2016 (last viewed Sept. 5, 2018).

[50] Posted by Shelley Cooper of Harrismith, WA, at http://www.hissingkitty.com/complaints-department/pyrex-cookware, on Dec. 15, 2017 (last viewed Sept. 5, 2018).

no glass in me so my question is; should I seek a injury Attorney or can you handle this matter.[51]

h.    I took my 2 Pyrex dishes out of oven after making dinner. I place[d one on the] counter on dry cloth and the other on top of stove. I walked to trash can heard a loud noise and the pan blew up all over the kitchen my children were in there thank good no one was really hurt just some cuts from glass. The explosion was so bad it broke the plastic on my coffee maker.[52]

83.    In conjunction with Defendants' experience in designing, manufacturing, and selling Pyrex, these consumer complaints and lawsuits confirm that Defendants knew about and actively concealed the inferior and dangerous nature of soda lime Pyrex from Plaintiffs, Class Members, and the general public. Despite this knowledge, Defendants have failed to implement any changes to address the way they formulate, design, manufacture, market, and sell Pyrex to consumers.

84.    Defendants are experienced in the design and manufacture of glassware, and likely conducted and continue to conduct testing on their Pyrex products. Such tests would be designed to assure quality control and to verify that the Pyrex products are free from defects. As a result, Defendants knew or should have known about the inferior and dangerous nature of soda lime Pyrex.

85.    Plaintiff and Class Members suffered damages as a direct result of Defendants' deceptive practices.

**G.**    **Defendants' Misrepresentations and Unlawful Failure to Disclose the Defect**

86.    Defendants had a duty to disclose and not to conceal the Defect from Plaintiffs and the public. Defendants breached this duty when they failed to disclose the change in glass

---

[51] Posted by Karen Hering of Phoenix, AZ. at *id.*, on Nov. 21, 2017.

[52] Posted by Lisa Ketchum of Fort Myers, FL, at *id.*, on Oct. 14, 2017.

formulation to consumers, failed to ensure that the quality and safety of Pyrex glassware remained unchanged with the change in formulation, and failed to recall the defective Pyrex products.

87.     Defendants continue to falsely represent through both express and implied warranties that Pyrex is free from defects, of merchantable quality, and able to perform dependably for years of normal household use. In every sale of Pyrex products, Defendants warrant that Pyrex is fit for the ordinary purpose for which such goods are used and are free from defects.[53]

88.     When communicating with customers, Defendants do not disclose that Pyrex glassware suffers from the Defect. As a result, reasonable consumers, including Plaintiffs and Class Members, purchased and used—and continue to purchase and use—Pyrex in their homes without knowledge that it is unsafe to do so.

89.     Defendants have wrongfully placed the burden, expense, and difficulty involved in discovering the Defect on Plaintiffs and Class Members, forcing the consumers to replace failed Pyrex and pay for the cost of personal injuries and/or property damage.

90.     Defendants have attempted to avoid liability for their dangerous product by adding a set of complex and contradictory warnings to their website and packaging inserts.  These warnings are inconsistent with well-known consumer perceptions about Pyrex that Defendants carefully crafted during the borosilicate years and continued to maintain despite the change to soda lime glass. For example, consumers are directed to avoid "sudden temperature changes to glassware" even though Pyrex glassware "can be used for cooking, baking, warming and reheating food in microwave ovens and preheated conventional or convection ovens."[54]

---

[53] *PYREX Limited Two-Year Warranty*, http://www.pyrexware.com/4.5-qt-oblong-baking-dish/5302470.html#start=2 (last viewed Sept. 5, 2018).

[54] https://www.pyrexware.com/use-care-pyrex.html (last viewed Sept. 5, 2018).

91.     Defendants knew or should have known that their confusing and contradictory instructions/statements are not reasonably likely to be understood by most consumers, whom Defendants have conditioned over decades to expect that Pyrex is fit for all household kitchen uses.

## PLAINTIFFS' EXPERIENCES

### Plaintiff Tricia Fullerton

92.     Plaintiff Tricia Fullerton is a resident of Brooklyn, Kings County, New York. In September of 2017, Plaintiff Fullerton's boyfriend purchased a Pyrex product for her. Ms. Fullerton read the safety and usage instructions included on the packaging and used her Pyrex to cook food in her oven as it was advertised to be used. Ms. Fullerton's Pyrex was covered by the same two-year Limited Warranty covering all Pyrex products. On February 9, 2018, Plaintiff Fullerton used her Pyrex to prepare chicken nuggets in her oven. Prior to cooking the chicken nuggets, Ms. Fullerton preheated her oven as required by the food's cooking instructions. After cooking the chicken nuggets for 15-20 minutes at 450°F, wearing a silicone oven mitt, Ms. Fullerton removed the dish from the oven and set it on top of her stove, which was turned off. As she was putting the dish on the stovetop—and while still grasping it with her hand—it shattered, sending the hot food in the dish and glass shards all over her kitchen. Because the oven mitt only covered a portion of her hand, Ms. Fullerton's hand was cut when the dish failed. Glass covered the floor to the extent that Plaintiff had to very cautiously "tip-toe" out of the kitchen to avoid getting cut. Photographs of Plaintiff Fullerton's kitchen and Pyrex dish after it shattered are included:

27



93.     Shortly after her Pyrex shattered, Plaintiff Fullerton contacted the Customer Service Department of Corelle regarding the incident. They responded by telling her that their glassware products should always be placed on a dry cloth or potholder when being removed from the oven. They also stated that placing their glassware on an 80° cooktop following cooking would likely cause thermal shock which could in turn cause the glassware to shatter. They did not offer Ms. Fullerton any relief to compensate her for the loss of her baking dish.

94.     Had Plaintiff Fullerton been aware of the Defect, she would not have used Pyrex. She did not receive the benefit of the bargain for which the product was purchased.

**<u>Plaintiff Karyn Slepian</u>**

95.     Plaintiff Karyn Slepian is a resident of Dix Hills, Suffolk County, New York. In 2013, Plaintiff Slepian purchased a Pyrex product from a local retail store. Ms. Slepian read the

safety and usage instructions included on the packaging and used her Pyrex to cook food in her oven as it was advertised and intended to be used. Ms. Slepian's Pyrex baking dishes were covered by the same two-year Limited Warranty covering all Pyrex products.

96.     On February 20, 2018, Plaintiff Slepian cooked pre-marinated meat in her oven after preheating according to the cooking instructions. After cooking the meat for some time, Ms. Slepian reduced the heat from 450°F to 350°F according to the recipe's cooking instructions. After the meat completed cooking, Ms. Slepian lowered the temperature of the oven to its warm setting in order to keep the meat warm. Following that reduction in temperature and while the oven door was still closed, Ms. Slepian heard a loud "bang" while in another room. Upon opening the oven door, she discovered that the Pyrex baking dish had shattered, ejecting the hot contents of the dish and scattering glass shards all about her oven. A photograph of Plaintiff Slepian's oven and her Pyrex dish after it shattered is included:



97.     After allowing the oven to cool, Plaintiff Slepian cleaned her oven to remove the glass shards. Ms. Slepian suffered minor cuts on her hands as a result of having to pick glass out from the bottom of her oven.

98.     Had Plaintiff Slepian been aware of the Defect, she would not have purchased or used Pyrex, or else would have paid significantly less for it. She did not receive the benefit of her bargain.

**Plaintiff Claribel Grau**

99.     Plaintiff Claribel Grau is a resident of Tampa, Hillsborough County, Florida. On June 3, 2018, Plaintiff Grau purchased a Pyrex product from her local Target store. Ms. Grau read the safety and usage instructions included on the packaging and used her Pyrex to cook food in her oven as it was advertised to be used. Ms. Grau's Pyrex was covered by the same two-year Limited Warranty covering all Pyrex products.

100.    On the same day that Plaintiff Grau purchased the Pyrex, she used it to prepare banana bread in the oven. Prior to baking the banana bread, Ms. Grau preheated her oven as required by the recipe's cooking instructions. After baking the banana bread for about 30 minutes at 320°F, Ms. Grau removed the baking dish from the oven and placed it on a cloth trivet on her countertop. After letting the banana bread cool on the trivet for approximately 5 to 7 minutes, Ms. Grau attempted to cut a piece of the banana bread. As Ms. Grau was cutting the banana bread, her Pyrex dish shattered, showering Plaintiff Grau with shards of glass and scattering glass fragments about her kitchen. Photographs of Plaintiff Grau's countertop and her Pyrex dish after it shattered are included:





101.    On June 13, 2018, Plaintiff Grau contacted Corelle's Consumer Care Center to report her exploding Pyrex baking dish incident. After noting the details of Ms. Grau's incident, the Corelle representative offered to send a replacement dish. Ms. Grau questioned whether the replacement dish would have the same Defect.

102.     Had Plaintiff Grau been aware of the Defect, she would not have purchased Pyrex, or else would have paid significantly less for it. She did not receive the benefit of her bargain.

**Plaintiff Jan Simon**

103.     Plaintiff Jan Simon is a resident of St. Johns, Clinton County, Michigan. In or about September of 2010, Plaintiff Simon received a piece of Pyrex as a gift. Ms. Simon read the safety and usage instructions included on the packaging and used her Pyrex to cook food in her oven as it was advertised to be used. Ms. Simon's Pyrex glass baking dish was covered by the same two-year Limited Warranty covering all Pyrex products.

104.     On or about September 25, 2014, Plaintiff Simon cooked chicken breasts in her oven after adding broth to the bottom of the 9" x 13" Pyrex glass baking dish while it was still cool and preheating to 350º F according to the cooking instructions. After cooking the chicken for 30 minutes, Ms. Simon opened the oven and removed the sheet of aluminum foil with which she covered the baking dish. As she was removing the aluminum foil, the Pyrex baking dish shattered, ejecting hot liquid and glass shards from her oven and covering her kitchen floor. Photographs of Plaintiff Simon's oven and her Pyrex dish after it shattered are included:







105.    On September 26, 2014, Ms. Simon contacted the Consumer Product Safety Commission ("CPSC") via email to report the incident. The CPSC responded the same day and suggested that Ms. Simon file a report via the SaferProducts.gov website. That same day, Ms. Simon filed a report with SaferProducts.gov that was subsequently forwarded to Corelle.

106.    On May 12, 2016, a representative of Corelle (then doing business as World Kitchen, LLC) responded by providing Ms. Simon with a survey to fill out. Ms. Simon responded to the survey as requested and returned her responses to the Corelle representative.

107.    On May 13, 2016, a representative of Corelle emailed Ms. Simon to inform her that because she did not save what remained of the broken Pyrex baking dish, they could not determine the cause of the explosion. They did, however, offer her a $25.00 credit towards the purchase of a new item manufactured by Corelle. Ms. Simon ordered two baking dishes manufactured by Corelle under their Corningware brand. The dishes subsequently arrived from the manufacturer shattered and unusable on June 2, 2016.

108.    Had Plaintiff Simon been aware of the Defect, she would not have used Pyrex. She did not receive the benefit of the bargain for which the product was purchased.

**Plaintiff Kelly Cashmore**

109.    Plaintiff Cashmore is a resident of McHenry, McHenry County, Illinois.  In or about June 2016, Plaintiff purchased a new Pyrex glass measuring cup from a Walmart in Johnsburg, Illinois. Ms. Cashmore read the usage instructions included on the packaging and used her Pyrex measuring cup to cook food in her microwave as it was advertised and intended to be used. Ms. Cashmore's Pyrex measuring cup were covered by the same two-year Limited Warranty covering all Pyrex products.

110.    In or about September 2016, Plaintiff Cashmore heated a gravy mix in her microwave. Prior to heating, Ms. Cashmore confirmed on the Pyrex product packaging that the Pyrex measuring cup was microwave safe. Immediately prior, Ms. Cashmore retrieved her Pyrex measuring cup from the cabinet. She put the gravy mix in her Pyrex measuring cup with one cup of water and placed it in the microwave. She did not adjust any of the microwave's power settings and set the microwave to heat for 60 seconds. After the time had elapsed and the microwave indicated that it had finished heating the gravy, Ms. Cashmore opened the microwave to reach remove the Pyrex measuring cup. As she reached for the measuring cup, but before actually touching it, the Pyrex measuring cup exploded, sending shards of glass and hot gravy throughout her microwave and into her kitchen. Ms. Cashmore received a small cut on her arm from the shards of glass. Ms. Cashmore had made other food that she was forced to throw away because they had been covered in gravy and shards of glass.

111.    Prior to this, Ms. Cashmore had heated liquids in her Pyrex measuring cup in the microwave on multiple other occasions without incident.

36

112.    Had Plaintiff Cashmore been aware of the Defect, she would not have purchased or used Pyrex, or else would have paid significantly less for it. She did not receive the benefit of her bargain.

**Plaintiff Marcia Schutte**

113.    Plaintiff Marcia Schutte is a resident of Cleves, Hamilton County, Ohio.  In or about April 2018, Plaintiff purchased several new Pyrex bowls from a Kroger store in Ohio. Ms. Schutte read the safety and usage instructions included on the packaging and used her Pyrex product to cook food in her oven as it was advertised and intended to be used. Ms. Schutte's Pyrex baking dishes were covered by the same two-year Limited Warranty covering all Pyrex products. A photograph of Plaintiff Schutte's newly purchased Pyrex glassware is included:



114.    Shortly after her purchase, in or about April 2018, Plaintiff Schutte cooked soup in a stock pot on her stovetop, turned off the burner, and served the soup in bowls. While the remaining soup cooled in the pot, Ms. Schutte placed one of her new empty Pyrex bowls on the counter. After she finished eating, Ms. Schutte ladled the remaining soup into the Pyrex bowl with one hand and stabilized the bowl with her other hand. While she was ladling soup, the Pyrex bowl shattered in her hand. Sharp shards of glass flew in all directions throughout the kitchen, including

into the stock pot and even into her clothing. Photographs of Plaintiff Schutte's Pyrex bowl after it shattered are included:





115.     Had Plaintiff Schutte been aware of the Defect, she would not have purchased or used her Pyrex glassware, or else would have paid significantly less for it. She did not receive the benefit of her bargain.

**Plaintiff Martha Klein**

116.     Plaintiff Martha Klein is a resident of Ipswich, Essex County, Massachusetts. In 2013, Plaintiff Klein purchased a new Pyrex dish from a Walmart store in Massachusetts. Ms. Klein read the safety and usage instructions included on the packaging and used her Pyrex glassware to cook food in her oven as it was advertised to be used. Ms. Klein's Pyrex baking dishes were covered by the same two-year Limited Warranty covering all Pyrex products.

117.     In or about August 2018, Plaintiff Klein cooked meatballs in her oven using her Pyrex dish. After the meatballs had finished cooking, Ms. Klein transferred the meatballs from the Pyrex dish to a pot of sauce. Ms. Klein then placed the empty Pyrex dish on the laminate counter. She sat down to eat and within minutes the Pyrex dish exploded, sending sharp shards of glass flying in all directions throughout her kitchen. Ms. Klein then carefully gathered the sharp shards from her shattered Pyrex dish from throughout her kitchen and collected them together. A photograph of the collected shards from Plaintiff Klein's shattered Pyrex dish is included:



118.    Had Plaintiff Klein been aware of the Defect, she would not have purchased or used her Pyrex glassware, or else would have paid significantly less for it. She did not receive the benefit of her bargain.

## CLASS ALLEGATIONS

119.    Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the "Nationwide Class":

> *All persons in the United States who purchased or own Pyrex manufactured from soda lime glass.*

120.    Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the "New York Class":

> *All persons who reside in New York who purchased or own Pyrex manufactured from soda lime glass.*

121.    Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the "Florida Class":

> *All persons who reside in Florida who purchased or own Pyrex manufactured from soda lime glass.*

122.    Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the "Michigan Class":

> *All persons who reside in Michigan who purchased or own Pyrex manufactured from soda lime glass.*

123.    Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the "Illinois Class":

> *All persons who reside in Illinois who purchased or own Pyrex manufactured from soda lime glass.*

124.    Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the "Ohio Class":

> *All persons who reside in Ohio who purchased or own Pyrex manufactured from soda lime glass.*

125.     Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of the "Massachusetts Class":

> *All persons who reside in Massachusetts who purchased or own Pyrex manufactured from soda lime glass*

126.     The Nationwide Class and State Classes are collectively referred to herein as the "Class" or "Classes." Excluded from the Classes are: (a) any judge presiding over this action and members of their family; and (b) all officers, directors, and employees of Corning and Corelle.

127.     <u>Numerosity</u>: The members of each Class are so numerous that joinder of all members is impracticable. Corelle claims to sell more than 40 million pieces of Pyrex annually. While the exact number of Class Members is presently unknown, each Class consists of thousands, if not millions of people. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity.

128.     <u>Commonality</u>: Common questions of law and fact exist as to all members of each Class, including, without limitation:

   a.     Whether soda lime Pyrex is materially defective;

   b.     Whether the Defect creates an unreasonable risk that Pyrex experiences a change in temperature over and above its thermal shock resistance and cause the product to fail;

   c.     Whether Defendants knew or should have known that soda lime Pyrex was inferior and unreasonably dangerous at the time of sale;

   d.     Whether Defendants fraudulently concealed the Defect;

   e.     Whether Defendants breached express warranties relating to Pyrex;

f.   Whether Defendants breached implied warranties of merchantability relating to Pyrex;

g.   Whether Defendants are liable for selling defective soda lime Pyrex;

h.   Whether Defendants engaged in deceptive trade practices in the marketing and sale of Pyrex to consumers;

i.   Whether Defendants were and continue to be unjustly enriched through the sale of Pyrex to consumers;

j.   Whether Plaintiffs and Class Members are entitled to damages;

k.   Whether Plaintiffs and Class Members are entitled to replacement of their defective Pyrex; and

l.   Whether Plaintiffs and Class Members are entitled to equitable relief, including an injunction requiring a corrective notice campaign and/or a recall.

129.   <u>Typicality</u>: Plaintiffs have the same interest in this matter as all Class Members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class Members. Plaintiffs' and Class Members' claims all arise out the design and sale of the defective Pyrex that has created a significant safety risk to consumers, and from Defendants' failure to disclose the Defect.

130.   <u>Adequacy of Representation</u>: Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in consumer and product liability class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class Members.

131.   <u>Injunctive/Declaratory Relief</u>: The elements of Rule 23(b)(2) are met. Defendants will continue to commit the unlawful practices alleged herein, and Class Members will remain at an unreasonable and serious safety risk as a result of the Defect. Defendants have acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

132.   Predominance: The elements of Rule 23(b)(3) are met. The common questions of law and fact enumerated above predominate over the questions affecting only individual Class Members, and a class action is the superior method for the fair and efficient adjudication of this controversy. The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources will be unnecessarily depleted by resolution of individual claims. Joinder on an individual basis of hundreds or thousands of claimants in one suit would be impractical or impossible. Individualized rulings and judgments could result in inconsistent relief for similarly-situated Plaintiffs.

## TOLLING OF THE STATUTES OF LIMITATIONS

133.   The claims alleged herein accrued upon the discovery of the Defect which manifests itself when Pyrex fails. Because the Defect is hidden and Defendants failed to disclose the true character, nature, and quality of soda lime Pyrex through concealment, Plaintiffs and the Class Members did not discover, and could not have discovered, the Defect through reasonable and diligent investigation. Thus, any applicable statutes of limitations have been tolled by Defendants' knowledge, misrepresentation, and/or concealment and denial of the facts as alleged herein. Plaintiffs and the Class Members could not have reasonably discovered the Defect before it manifests. As a result of Defendants' active and continuing concealment of the Defect and/or failure to inform Plaintiffs and the Class Members of the Defect, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

134.   Defendants fraudulently concealed material facts from Plaintiffs, Class Members, consumers, and the public. Defendants knew that soda lime Pyrex had a significantly lower thermal shock resistance than its borosilicate glassware counterpart but concealed those facts such that

consumers had no such knowledge of the Defect. Defendants had a duty to disclose the Defect to Plaintiffs and Class Members, but it failed to do so. Further, Defendants also knew that Plaintiffs and Class Members had no knowledge that Pyrex was defective and that Plaintiffs and Class Members did not have an equal opportunity to discover the facts regarding the Defect. Defendants were in a superior position than Plaintiffs and Class Members, but fraudulently concealed the Defect in soda lime Pyrex from them. Through this concealment, Defendants intended to induce Plaintiffs and Class Members to purchase the defective Pyrex, and Defendants benefitted as a result of its fraudulent concealment from sales of defective Pyrex. In furtherance of this concealment: (1) Defendants actively attempted to refute any reports or claims, as discussed herein, that noted that soda lime Pyrex glassware was defective and weaker than previous borosilicate Pyrex glass products; and (2) when Plaintiffs and Class Members experienced problems with the defective Pyrex and notified Corelle to make warranty claims, Corelle, as discussed herein, routinely told them that they had failed to use the Pyrex glassware as instructed. As a result of Defendants' active and continuing fraudulent concealment of the Defect and/or failure to inform Plaintiffs and the Class Members of the Defect, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FIRST CLAIM FOR RELIEF
### Breach of Written Warranties under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq.*
### (On behalf of Plaintiffs and the Nationwide Class against Defendants Corelle)

135. Plaintiffs hereby re-allege and incorporate all allegations raised in the preceding Paragraphs into this cause of action and claim for relief as if fully set forth herein.

136. Plaintiffs and Class Members are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

137.     Corelle is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

138.     Pyrex products are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

139.     Corelle's Limited Warranty applicable to Pyrex products is a "written warranty" within the meaning of the MMWA, 15 U.S.C. § 2301(6).

140.     In connection with its sale of Pyrex products, Corelle expressly warranted that it was free from defects and suitable for cooking at standard cooking temperatures.

141.     The Warranty states: "Corelle Brands, LLC promises to replace any Pyrex glass product that breaks from oven heat, and any Pyrex non-glass accessory item with a manufacturing defect, within TWO YEARS from the date of purchase."[55]

142.     Pyrex is defectively designed as a whole unit and is covered by Corelle's Limited Warranty, set forth above.

143.     Each Pyrex product has an identical or substantially identical warranty.

144.     Plaintiffs and the Class Members have privity of contract with Corelle through their purchase of Pyrex, and through the express written and implied warranties that Corelle issued to its customers. Corelle's warranties accompanied Pyrex products and were intended to benefit consumers of Pyrex. To the extent Class Members purchased Pyrex from third-party retailers or received Pyrex as a donee of a purchaser, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Corelle, third-party retailers, and purchasers.

---

[55] *E.g., PYREX Limited Two-Year Warranty*, http://www.pyrexware.com/4.5-qt-oblong-baking-dish/5302470.html#start=2 (last viewed Sept. 5, 2018).

145. The express written warranties covering Pyrex products were a material part of the bargain between Corelle and consumers. At the time it made these express warranties, Corelle knew of the purpose for which Pyrex was to be used.

146. Corelle breached its express warranties by selling Pyrex that was, in actuality, not free of defects, not made for years of dependable use, not made from merchantable material and workmanship, and could not be safely used for the ordinary purpose of preparing meals at home. Corelle breached its express written warranties to Plaintiffs and Class Members in that Pyrex ontains the Defect on the very first day of purchase, creating a serious safety risk to Plaintiffs and Class Members.

147. Pyrex that Plaintiffs purchased were subject to the Defect and caused each of them damages including loss of the product, loss of the benefit of their bargain, personal injuries, and property damage.

148. Corelle expressly warranted in writing that it "promises to replace any Pyrex glass product *that breaks from oven heat*, and any Pyrex non-glass accessory item with a manufacturing defect, within TWO YEARS from the date of purchase." (Emphasis added).

149. Plaintiffs Fullerton, Grau, and Simon notified Corelle of its breach of the express warranty shortly after their Pyrex failed to perform as warranted as a result of the Defect. Moreover, Corelle was put on constructive notice about its breach through its review of consumer complaints and media reports described herein, and, upon information and belief, through product testing.

150. Corelle breached its express warranty to replace the defective Pyrex when it failed to do so despite its knowledge of the Defect, and/or despite its knowledge of alternative designs, materials, and/or options for manufacturing Pyrex.

151.    To the extent that Corelle offered to replace the defective products, the warranty of replacement fails in its essential purpose because it is insufficient to make Plaintiffs and Class Members whole because the warranty covering Pyrex only "promises to replace any Pyrex glass product that breaks from oven heat." The replacement under the warranty does not apply to all defective Pyrex—it only applies to Pyrex that has already manifested the latent Defect and has already failed. The warranty of replacement of failed or broken Pyrex is insufficient to adequately cover all Pyrex, or cannot do so within the time period under the warranty (two years).

152.    Many of the damages resulting from the defective Pyrex cannot be resolved through the limited remedy replacement, as incidental and consequential damages have already been suffered due to Corelle's conduct as alleged herein.

153.    Accordingly, recovery by Plaintiffs and Class Members is not limited to the limited warranty replacement, and they seek all remedies allowed by law.

154.    Upon information and belief, Corelle received further notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing. Corelle also received such notice through Plaintiffs who complained to Corelle about defective Pyrex, as described above.

155.    Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiffs and Class Members, and failed to provide any form of compensation for the damages resulting from the Defect.

156.    As a result of Corelle's breach of its express written warranties, Plaintiffs and Class Members have suffered damages and have been deprived of the benefit of their bargain.

157. The amount in controversy of Plaintiffs' and Class Members' claims meet or exceed the sum or value of $50,000.00, and there are more than one hundred (named or unnamed) Class Members.

158. Corelle has been afforded a reasonable opportunity to cure its breach of written warranties, including, when Plaintiffs contacted Corelle regarding replacement of the defective Pyrex.

159. As a direct and proximate cause of Corelle's breach of written warranties, Plaintiffs and Class members did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for Pyrex with the Defect in addition to loss of the Product and its intended benefits. Corelle's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value at the point of sale, costs, including statutory attorneys' fees, and/or other relief as appropriate.

**SECOND CLAIM FOR RELIEF**
**Breach of New York's Express Warranty Statute,**
**N.Y. U.C.C. Law § 2-313**
**(On behalf of Plaintiff Fullerton, Plaintiff Slepian,**
**and the New York Class against Defendants Corelle)**

160. Plaintiffs Fullerton and Slepian hereby re-allege and incorporate all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

161. In connection with its sale of Pyrex, Corelle expressly warranted that it was free from defects and suitable for cooking at high temperatures.

162.    The Warranty states: "Corelle Brands, LLC promises to replace any Pyrex glass product that breaks from oven heat, and any Pyrex non-glass accessory item with a manufacturing defect, within TWO YEARS from the date of purchase."

163.    Pyrex is defectively designed as a whole unit and is covered by Corelle's Limited Warranty, set forth above.

164.    Each Pyrex product has an identical or substantially identical warranty.

165.    Plaintiffs Fullerton and Slepian and the Class Members have privity of contract with Corelle through their purchase of Pyrex, and through the express written and implied warranties that Corelle issued to its customers. Corelle's warranties accompanied Pyrex and were intended to benefit consumers of Glassware. To the extent Class Members purchased Pyrex from third-party retailers, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Corelle and third-party retailers and because the express warranty is intended to benefit purchasers or owners subsequent to the third-party retailer.

166.    The express written warranties covering Pyrex were a material part of the bargain between Corelle and consumers. At the time it made these express warranties, Corelle knew of the purpose for which Pyrex was to be used.

167.    Corelle breached its express warranties by selling Pyrex that was, in actuality, not free of defects, not made for years of dependable use, not made from merchantable material and workmanship, and could not be safely used for the ordinary purpose of preparing meals at home. Corelle breached its express written warranties to Plaintiffs and Class Members in that Pyrex contains the Defect on the very first day of purchase, creating a serious safety risk to Plaintiffs and Class Members.

168.    Pyrex that Plaintiffs and Class Members purchased were subject to the Defect and caused each of them damages including loss of the product, loss of the benefit of their bargain, personal injuries, and property damage.

169.    Plaintiff Fullerton notified Corelle of its breach of the express warranty shortly after her Pyrex failed to perform as warranted as a result of the Defect. Moreover, Corelle was put on constructive notice about its breach through its review of consumer complaints and media reports described herein, and, upon information and belief, through product testing.

170.    Corelle breached its express warranty to replace the defective Pyrex when it failed to do so despite its knowledge of the Defect, and/or despite its knowledge of alternative designs, materials, and/or options for manufacturing Pyrex.

171.    To the extent that Corelle offers to replace Pyrex, the warranty of replacement fails in its essential purpose because it is insufficient to make Plaintiffs and Class Members whole because the warranty covers only "promises to replace any Pyrex glass product that *breaks from oven heat*." (Emphasis added). The replacement under the warranty does not apply to all defective Pyrex—it only applies to Pyrex that has already manifested the latent Defect and has already failed. The warranty regarding failed or broken Pyrex is insufficient to adequately cover all defective Pyrex, or cannot do so within the time period under the warranty (two years).

172.    The warranty of replacement further fails in its essential purpose because Corelle replaces the defective and failed Pyrex products with other defective Pyrex products. Following warranty replacement, Plaintiffs and Class Members still possess and use defective Pyrex such that their replacement Pyrex product still contains the Defect.

173.    Many of the damages resulting from the defective Pyrex cannot be resolved through the limited remedy of replacement, as incidental and consequential damages have already been suffered due to Corelle's conduct as alleged herein.

174.    Accordingly, recovery by Plaintiffs and Class Members is not limited to the limited warranty of replacement, and they seek all remedies allowed by law.

175.    Upon information and belief, Corelle received further notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing. Corelle also received such notice through Plaintiff Fullerton who complained to Corelle about defective Pyrex, as described above.

176.    Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiffs and Class Members and failed to provide any form of compensation for the damages resulting from the Defect.

177.    As a direct and proximate cause of Corelle's breach of its express written warranties, Plaintiffs and Class members did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for Pyrex with the Defect in addition to loss of the Product and its intended benefits.

**THIRD CLAIM FOR RELIEF**
**Breach of Florida's Express Warranty Statute,**
**Fla. Stat. § 672.313**
**(On behalf of Plaintiff Grau and the Florida Class against Defendants Corelle)**

178.    Plaintiff Grau hereby re-alleges incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

179.    In connection with its sale of Pyrex, Corelle expressly warranted that it was free from defects and suitable for cooking at high temperatures.

180.    The Warranty states: "Corelle Brands, LLC promises to replace any Pyrex glass product that breaks from oven heat, and any Pyrex non-glass accessory item with a manufacturing defect, within TWO YEARS from the date of purchase."

181.    Pyrex is defectively designed as a whole unit and is covered by Corelle's Limited Warranty, set forth above.

182.    Each Pyrex product has an identical or substantially identical warranty.

183.    Plaintiff Grau and the Class Members have privity of contract with Corelle through their purchase of Pyrex, and through the express written and implied warranties that Corelle issued to its customers. Corelle's warranties accompanied Pyrex and were intended to benefit consumers of Glassware. To the extent Class Members purchased Pyrex from third-party retailers, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Corelle and third-party retailers and because the express warranty is intended to benefit purchasers or owners subsequent to the third-party retailer.

184.    The express written warranties covering Pyrex were a material part of the bargain between Corelle and consumers. At the time it made these express warranties, Corelle knew of the purpose for which Pyrex was to be used.

185.    Corelle breached its express warranties by selling Pyrex that was, in actuality, not free of defects, not made for years of dependable use, not made from merchantable material and workmanship, and could not be safely used for the ordinary purpose of preparing meals at home. Corelle breached its express written warranties to Plaintiff and Class Members in that Pyrex contains the Defect on the very first day of purchase, creating a serious safety risk to Plaintiffs and Class Members.

186. Pyrex that Plaintiff and Class Members purchased was subject to the Defect and caused each of them damages including loss of the product, loss of the benefit of their bargain, personal injuries, and property damage.

187. Plaintiff Grau notified Corelle of its breach of the express warranty shortly after her Pyrex failed to perform as warranted as a result of the Defect. Moreover, Corelle was put on constructive notice about its breach through its review of consumer complaints and media reports described herein, and, upon information and belief, through product testing.

188. Corelle breached its express warranty to replace the defective Pyrex when it failed to do so despite its knowledge of the Defect, and/or despite its knowledge of alternative designs, materials, and/or options for manufacturing Pyrex.

189. To the extent that Corelle offered to replace the defective products, the warranty of replacement fails in its essential purpose because it is insufficient to make Plaintiff and Class Members whole because the warranty covering Pyrex only "promises to replace any Pyrex glass product that breaks from oven heat." The replacement under the warranty does not apply to all defective Pyrex—it only applies to Pyrex that has already manifested the latent Defect and has already failed. The warranty of replacement of failed or broken Pyrex is insufficient to adequately cover all Pyrex, or cannot do so within the time period under the warranty (two years).

190. The warranty of replacement further fails in its essential purpose because Corelle replaces the defective and failed Pyrex products with other defective Pyrex products. Following warranty replacement, Plaintiff and Class Members still possess and use defective Pyrex such that their replacement Pyrex product still contains the Defect.

191.    Many of the damages resulting from the defective Pyrex cannot be resolved through the limited remedy of replacement, as incidental and consequential damages have already been suffered due to Corelle's conduct as alleged herein.

192.    Accordingly, recovery by Plaintiff and Class Members is not limited to the limited warranty of replacement, and they seek all remedies allowed by law.

193.    Upon information and belief, Corelle received further notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing. Corelle also received such notice through Plaintiff Fullerton who complained to Corelle about the defective Pyrex, as described above.

194.    Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiff and Class Members and failed to provide any form of compensation for the damages resulting from the Defect.

195.    As a direct and proximate cause of Corelle's breach of its express written warranties, Plaintiff and Class members did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for Pyrex with the Defect.

**FOURTH CLAIM FOR RELIEF**
**Breach of Michigan's Express Warranty Statute,**
**Mich. Comp. Laws § 440.2313**
**(On behalf of Plaintiff Simon and the Michigan Class against Defendants Corelle)**

196.    Plaintiff Simon hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

197.    In connection with its sale of Pyrex, Corelle expressly warranted that it was free from defects and suitable for cooking at high temperatures.

198.    The Warranty states: "Corelle Brands, LLC promises to replace any Pyrex glass product that breaks from oven heat, and any Pyrex non-glass accessory item with a manufacturing defect, within TWO YEARS from the date of purchase."

199.    Pyrex is defectively designed as a whole unit and is covered by Corelle's Limited Warranty, set forth above.

200.    Each Pyrex product has an identical or substantially identical warranty.

201.    Plaintiff Simon and the Class Members have privity of contract with Corelle through their purchase of Pyrex, and through the express written and implied warranties that Corelle issued to its customers. Corelle's warranties accompanied Pyrex and were intended to benefit consumers of Pyrex. To the extent Class Members purchased Pyrex from third-party retailers or received Pyrex as a done of a purchaser, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Corelle, third-party retailers, and purchasers.

202.    The express written warranties covering Pyrex were a material part of the bargain between Corelle and consumers. At the time it made these express warranties, Corelle knew of the purpose for which Pyrex was to be used.

203.    Corelle breached its express warranties by selling Pyrex that was, in actuality, not free of defects, not made for years of dependable use, not made from merchantable material and workmanship, and could not be safely used for the ordinary purpose of preparing meals at home. Corelle breached its express written warranties to Plaintiff and Class Members in that Pyrex contains the Defect on the very first day of purchase, creating a serious safety risk to Plaintiff and Class Members.

204.    Pyrex that Plaintiff and Class Members purchased were subject to the Defect and caused each of them damages including loss of the product, loss of the benefit of their bargain, personal injuries, and property damage.

205.    Plaintiff Simon notified Corelle of its breach of the express warranty shortly after her Pyrex failed to perform as warranted as a result of the Defect. Moreover, Corelle was put on constructive notice about its breach through its review of consumer complaints and media reports described herein, and, upon information and belief, through product testing.

206.    Corelle breached its express warranty to replace the defective Pyrex when it failed to do so despite its knowledge of the Defect, and/or despite its knowledge of alternative designs, materials, and/or options for manufacturing Pyrex.

207.    To the extent that Corelle offered to replace the defective products, the warranty of replacement fails in its essential purpose because it is insufficient to make Plaintiff and Class Members whole because the warranty covering Pyrex only "promises to replace any Pyrex glass product that breaks from oven heat." The replacement under the warranty does not apply to all defective Pyrex—it only applies to Pyrex that has already manifested the latent Defect and has already failed. The warranty of replacement of failed or broken Pyrex is insufficient to adequately cover all Pyrex, or cannot do so within the time period under the warranty (two years).

208.    The warranty of replacement further fails in its essential purpose because Corelle replaces the defective and failed Pyrex products with other defective Pyrex products. Following warranty replacement, Plaintiff and Class Members still possess and use defective Pyrex such that their replacement Pyrex product still contains the Defect.

209.     Many of the damages resulting from the defective Pyrex cannot be resolved through the limited remedy of replacement, as incidental and consequential damages have already been suffered due to Corelle's conduct as alleged herein.

210.     Accordingly, recovery by Plaintiffs and Class Members is not limited to the limited warranty of replacement, and they seek all remedies allowed by law.

211.     Upon information and belief, Corelle received further notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing. Corelle also received such notice through Plaintiff Simon who complained to Corelle about the defective Pyrex, as described above.

212.     Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiff and Class Members and failed to provide any form of compensation for the damages resulting from the Defect.

213.     As a direct and proximate cause of Corelle's breach of its express written warranties, Plaintiffs and Class members did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for Pyrex with the Defect.

**FIFTH CLAIM FOR RELIEF**
**Breach of Illinois's Express Warranty Statute,**
**810 Ill. Comp. Stat. 5/2-313**
**(On behalf of Plaintiff Cashmore and the Illinois Class against Defendants Corelle)**

214.     Plaintiff Cashmore hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

215.     In connection with its sale of Pyrex, Corelle expressly warranted that it was free from defects and suitable for cooking at high temperatures.

216.    The Warranty states: "Corelle Brands, LLC promises to replace any Pyrex glass product that breaks from oven heat, and any Pyrex non-glass accessory item with a manufacturing defect, within TWO YEARS from the date of purchase."

217.    Pyrex is defectively designed as a whole unit and is covered by Corelle's Limited Warranty, set forth above.

218.    Each Pyrex product has an identical or substantially identical warranty.

219.    Plaintiff Cashmore and the Class Members have privity of contract with Corelle through their purchase of Pyrex, and through the express written and implied warranties that Corelle issued to its customers. Corelle's warranties accompanied Pyrex and were intended to benefit consumers of Pyrex. To the extent Class Members purchased Pyrex from third-party retailers or received Pyrex as a done of a purchaser, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Corelle, third-party retailers, and purchasers.

220.    The express written warranties covering Pyrex were a material part of the bargain between Corelle and consumers. At the time it made these express warranties, Corelle knew of the purpose for which Pyrex was to be used.

221.    Corelle breached its express warranties by selling Pyrex that was, in actuality, not free of defects, not made for years of dependable use, not made from merchantable material and workmanship, and could not be safely used for the ordinary purpose of preparing meals at home. Corelle breached its express written warranties to Plaintiff and Class Members in that Pyrex contains the Defect on the very first day of purchase, creating a serious safety risk to Plaintiff and Class Members.

222.    Pyrex that Plaintiff and Class Members purchased were subject to the Defect and caused each of them damages including loss of the product, loss of the benefit of their bargain, personal injuries, and property damage.

223.    Corelle breached its express warranty to replace the defective Pyrex when it failed to do so despite its knowledge of the Defect, and/or despite its knowledge of alternative designs, materials, and/or options for manufacturing Pyrex.

224.    To the extent that Corelle offered to replace the defective products, the warranty of replacement fails in its essential purpose because it is insufficient to make Plaintiff and Class Members whole because the warranty covering Pyrex only "promises to replace any Pyrex glass product that breaks from oven heat." The replacement under the warranty does not apply to all defective Pyrex—it only applies to Pyrex that has already manifested the latent Defect and has already failed. The warranty of replacement of failed or broken Pyrex is insufficient to adequately cover all Pyrex, or cannot do so within the time period under the warranty (two years).

225.    The warranty of replacement further fails in its essential purpose because Corelle replaces the defective and failed Pyrex products with other defective Pyrex products. Following warranty replacement, Plaintiff and Class Members still possess and use defective Pyrex such that their replacement Pyrex product still contains the Defect.

226.    Many of the damages resulting from the defective Pyrex cannot be resolved through the limited remedy of replacement, as incidental and consequential damages have already been suffered due to Corelle's conduct as alleged herein.

227.    Accordingly, recovery by Plaintiff and Class Members is not limited to the limited warranty of replacement, and they seek all remedies allowed by law.

228.     Upon information and belief, Corelle received further notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing.

229.     Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiff and Class Members and failed to provide any form of compensation for the damages resulting from the Defect.

230.     As a direct and proximate cause of Corelle's breach of its express written warranties, Plaintiff and Class members did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for Pyrex with the Defect.

**SIXTH CLAIM FOR RELIEF**
**Breach of Ohio's Express Warranty Statute,**
**Ohio Rev. Code Ann. § 1302.26**
**(On behalf of Plaintiff Schutte and the Ohio Class against Defendants Corelle)**

231.     Plaintiff Schutte hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

232.     In connection with its sale of Pyrex, Corelle expressly warranted that it was free from defects and suitable for cooking at high temperatures.

233.     The Warranty states: "Corelle Brands, LLC promises to replace any Pyrex glass product that breaks from oven heat, and any Pyrex non-glass accessory item with a manufacturing defect, within TWO YEARS from the date of purchase."

234.     Pyrex is defectively designed as a whole unit and is covered by Corelle's Limited Warranty, set forth above.

235.     Each Pyrex product has an identical or substantially identical warranty.

236.     Plaintiff Schutte and the Class Members have privity of contract with Corelle through their purchase of Pyrex, and through the express written and implied warranties that Corelle issued to its customers. Corelle's warranties accompanied Pyrex and were intended to benefit consumers of Pyrex. To the extent Class Members purchased Pyrex from third-party retailers or received Pyrex as a done of a purchaser, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Corelle, third-party retailers, and purchasers.

237.     The express written warranties covering Pyrex were a material part of the bargain between Corelle and consumers. At the time it made these express warranties, Corelle knew of the purpose for which Pyrex was to be used.

238.     Corelle breached its express warranties by selling Pyrex that was, in actuality, not free of defects, not made for years of dependable use, not made from merchantable material and workmanship, and could not be safely used for the ordinary purpose of preparing meals at home. Corelle breached its express written warranties to Plaintiff and Class Members in that Pyrex contains the Defect on the very first day of purchase, creating a serious safety risk to Plaintiff and Class Members.

239.     Pyrex that Plaintiff and Class Members purchased were subject to the Defect and caused each of them damages including loss of the product, loss of the benefit of their bargain, personal injuries, and property damage.

240.     Corelle breached its express warranty to replace the defective Pyrex when it failed to do so despite its knowledge of the Defect, and/or despite its knowledge of alternative designs, materials, and/or options for manufacturing Pyrex.

241. To the extent that Corelle offered to replace the defective products, the warranty of replacement fails in its essential purpose because it is insufficient to make Plaintiff and Class Members whole because the warranty covering Pyrex only "promises to replace any Pyrex glass product that breaks from oven heat." The replacement under the warranty does not apply to all defective Pyrex—it only applies to Pyrex that has already manifested the latent Defect and has already failed. The warranty of replacement of failed or broken Pyrex is insufficient to adequately cover all Pyrex, or cannot do so within the time period under the warranty (two years).

242. The warranty of replacement further fails in its essential purpose because Corelle replaces the defective and failed Pyrex products with other defective Pyrex products. Following warranty replacement, Plaintiff and Class Members still possess and use defective Pyrex such that their replacement Pyrex product still contains the Defect.

243. Many of the damages resulting from the defective Pyrex cannot be resolved through the limited remedy of replacement, as incidental and consequential damages have already been suffered due to Corelle's conduct as alleged herein.

244. Accordingly, recovery by Plaintiff and Class Members is not limited to the limited warranty of replacement, and they seek all remedies allowed by law.

245. Upon information and belief, Corelle received notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing.

246. Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiff and Class Members and failed to provide any form of compensation for the damages resulting from the Defect.

247.     As a direct and proximate cause of Corelle's breach of its express written warranties, Plaintiff and Class members did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for Pyrex with the Defect.

**SEVENTH CLAIM FOR RELIEF**
**Breach of Massachusetts's Express Warranty Statute,**
**Mass. Gen. Laws ch. 106, § 2-313**
**(On behalf of Plaintiff Klein and the Massachusetts Class against Defendants Corelle)**

248.     Plaintiff Klein hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

249.     In connection with its sale of Pyrex, Corelle expressly warranted that it was free from defects and suitable for cooking at high temperatures.

250.     The Warranty states: "Corelle Brands, LLC promises to replace any Pyrex glass product that breaks from oven heat, and any Pyrex non-glass accessory item with a manufacturing defect, within TWO YEARS from the date of purchase."

251.     Pyrex is defectively designed as a whole unit and is covered by Corelle's Limited Warranty, set forth above.

252.     Each Pyrex product has an identical or substantially identical warranty.

253.     Plaintiff Klein and the Class Members have privity of contract with Corelle through their purchase of Pyrex, and through the express written and implied warranties that Corelle issued to its customers. Corelle's warranties accompanied Pyrex and were intended to benefit consumers of Pyrex. To the extent Class Members purchased Pyrex from third-party retailers or received Pyrex as a done of a purchaser, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Corelle, third-party retailers, and purchasers.

254.    The express written warranties covering Pyrex were a material part of the bargain between Corelle and consumers. At the time it made these express warranties, Corelle knew of the purpose for which Pyrex was to be used.

255.    Corelle breached its express warranties by selling Pyrex that was, in actuality, not free of defects, not made for years of dependable use, not made from merchantable material and workmanship, and could not be safely used for the ordinary purpose of preparing meals at home. Corelle breached its express written warranties to Plaintiff and Class Members in that Pyrex contains the Defect on the very first day of purchase, creating a serious safety risk to Plaintiff and Class Members.

256.    Pyrex that Plaintiff and Class Members purchased were subject to the Defect and caused each of them damages including loss of the product, loss of the benefit of their bargain, personal injuries, and property damage.

257.    Corelle breached its express warranty to replace the defective Pyrex when it failed to do so despite its knowledge of the Defect, and/or despite its knowledge of alternative designs, materials, and/or options for manufacturing Pyrex.

258.    To the extent that Corelle offered to replace the defective products, the warranty of replacement fails in its essential purpose because it is insufficient to make Plaintiff and Class Members whole because the warranty covering Pyrex only "promises to replace any Pyrex glass product that breaks from oven heat." The replacement under the warranty does not apply to all defective Pyrex—it only applies to Pyrex that has already manifested the latent Defect and has already failed. The warranty of replacement of failed or broken Pyrex is insufficient to adequately cover all Pyrex, or cannot do so within the time period under the warranty (two years).

259.    The warranty of replacement further fails in its essential purpose because Corelle replaces the defective and failed Pyrex products with other defective Pyrex products. Following warranty replacement, Plaintiff and Class Members still possess and use defective Pyrex such that their replacement Pyrex product still contains the Defect.

260.    Many of the damages resulting from the defective Pyrex cannot be resolved through the limited remedy of replacement, as incidental and consequential damages have already been suffered due to Corelle's conduct as alleged herein.

261.    Accordingly, recovery by Plaintiff and Class Members is not limited to the limited warranty of replacement, and they seek all remedies allowed by law.

262.    Upon information and belief, Corelle received notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing.

263.    Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiff and Class Members and failed to provide any form of compensation for the damages resulting from the Defect.

264.    As a direct and proximate cause of Corelle's breach of its express written warranties, Plaintiff and Class members did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for Pyrex with the Defect.

## EIGHTH CLAIM FOR RELIEF
**Breach of New York's Implied Warranty of Merchantability Statute,
N.Y. U.C.C. § 2-314
(On behalf of Plaintiff Fullerton, Plaintiff Slepian,
and the New York Class against Defendants Corelle)**

265.    Plaintiffs Fullerton and Slepian hereby re-allege and incorporate all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

266.    Pyrex products purchased by Plaintiffs Fullerton and Slepian and Class Members was defectively designed and manufactured and posed a serious and immediate safety risk to consumers and the public.

267.    All Pyrex sold by Corelle left Corelle's facilities and control with a Defect caused by a defective design incorporated into the manufacture of Pyrex.

268.    The Defect placed and/or places Plaintiffs and Class Members at risk of injury and/or property damage through the use of Pyrex in their homes.

269.    The law imposes a duty requiring manufacturers or sellers of a product to ensure that the product is merchantable and reasonably fit for the ordinary purposes for which such a product is used, and that the product is acceptable in trade for the product description. This implied warranty of merchantability is part of the basis of the bargain between Corelle and consumers, including Plaintiffs and the Class Members.

270.    Notwithstanding the aforementioned duty, at the time of delivery, Corelle breached the implied warranty of merchantability in that Pyrex is defective and poses a serious safety risk, was not fit for the ordinary purposes for which it was used, would not pass without objection, and failed to conform to the standard performance of like products.

271.    Corelle knew, or should have known, that Pyrex posed a safety risk and was defective, and that it breached the implied warranties at the time it sold Pyrex to Plaintiffs and Class Members or otherwise placed them into the stream of commerce.

272.    Plaintiffs Fullerton and Slepian and the Class Members have privity of contract with Corelle through their purchase of Pyrex, and through the express written and implied warranties that Corelle issued to its customers. Corelle's warranties accompanied Pyrex and were intended to benefit consumers of Pyrex. To the extent Class Members purchased Pyrex from third-party retailers, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Corelle and third-party retailers.

273.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiffs and Class Members bought Pyrex without knowledge of the Defect or the serious safety risks.

274.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiffs and Class Members purchased unsafe Pyrex products that were not fit to be used for their intended purpose of preparing food in a residential setting.

275.    Plaintiff Fullerton notified Corelle of their breach of the implied warranties shortly after their Pyrex failed to perform as warranted as a result of the Defect.

276.    Upon information and belief, Corelle received further notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing. Corelle also received notice through Plaintiff Fullerton who complained to Corelle about the Defect as described above.

277. Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiffs and Class Members and failed to provide any form of compensation for the damages resulting from the Defect.

278. As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiffs and Class Members have suffered damages.

**NINTH CLAIM FOR RELIEF**
**Breach of Florida's Implied Warranty of Merchantability Statute,**
**Fla. Stat. § 672.314**
**(On behalf of Plaintiff Grau and the Florida Class against Defendants Corelle)**

279. Plaintiff Grau hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

280. Pyrex purchased by Plaintiff Grau and Class Members was defectively designed and manufactured and posed a serious and immediate safety risk to consumers and the public.

281. All Pyrex sold by Corelle left Corelle's facilities and control with a Defect caused by a defective design incorporated into the manufacture of Pyrex.

282. The Defect placed and/or places Plaintiff and Class Members at risk of injury and/or property damage through the use of Pyrex in their homes.

283. The law imposes a duty requiring manufacturers or sellers of a product to ensure that the product is merchantable and reasonably fit for the ordinary purposes for which such a product is used, and that the product is acceptable in trade for the product description. This implied warranty of merchantability is part of the basis of the bargain between Corelle and consumers, including Plaintiffs and the Class Members.

284. Notwithstanding the aforementioned duty, at the time of delivery, Corelle breached the implied warranty of merchantability in that Pyrex is defective and poses a serious safety risk,

was not fit for the ordinary purposes for which it was used, would not pass without objection, and failed to conform to the standard performance of like products.

285.    Corelle knew, or should have known, that Pyrex posed a safety risk and was defective, and that it breached the implied warranties at the time it sold Pyrex to Plaintiffs and Class Members or otherwise placed them into the stream of commerce.

286.    Plaintiff and Class Members have privity of contract with Corelle through their purchase of Pyrex from Defendants, and through the express written and implied warranties that Defendants issued to its customers. Defendants' warranties accompanied Pyrex and were intended to benefit the ultimate consumers. To the extent that Class Members purchased Pyrex from third-party retailers, privity is not required because Plaintiffs and Class Members are intended third-party beneficiaries of the contracts between Corelle and the third-party retailers.

287.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiff and Class Members bought Pyrex without knowledge of the Defect or the serious safety risks.

288.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiff and Class Members purchased unsafe Pyrex products that were not fit to be used for their intended purpose of preparing food in a residential setting.

289.    Plaintiff Grau notified Corelle of their breach of the implied warranties shortly after their Pyrex failed to perform as warranted as a result of the Defect.

290.    Upon information and belief, Corelle received further notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it

over failures of Pyrex, and its own internal and external testing. Corelle also received notice through Plaintiff Grau who complained to Corelle about the Defect as described above.

291.    Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiff and Class Members and failed to provide any form of compensation for the damages resulting from the Defect.

292.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiff and Class Members have suffered damages.

**TENTH CLAIM FOR RELIEF**
**Breach of Michigan's Implied Warranty of Merchantability Statute**
**Mich. Comp. Laws § 440.2314**
**(On behalf of Plaintiff Simon and the Michigan Class against Defendants Corelle)**

293.    Plaintiff Simon hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

294.    Pyrex purchased by Plaintiff Simon and Class Members was defectively designed and manufactured and posed a serious and immediate safety risk to consumers and the public.

295.    All of Pyrex sold by Corelle left Corelle's facilities and control with a Defect caused by a defective design incorporated into the manufacture of Pyrex.

296.    The Defect placed and/or places Plaintiffs and Class Members at risk of injury and/or property damage through the use of Pyrex in their homes.

297.    The law imposes a duty requiring manufacturers or sellers of a product to ensure that the product is merchantable and reasonably fit for the ordinary purposes for which such a product is used, and that the product is acceptable in trade for the product description. This implied warranty of merchantability is part of the basis of the bargain between Corelle and consumers, including Plaintiffs and the Class Members.

298.    Notwithstanding the aforementioned duty, at the time of delivery, Corelle breached the implied warranty of merchantability in that Pyrex is defective and poses a serious safety risk, was not fit for the ordinary purposes for which it was used, would not pass without objection, and failed to conform to the standard performance of like products.

299.    Corelle knew, or should have known, that Pyrex posed a safety risk and was defective, and that it breached the implied warranties at the time it sold Pyrex to Plaintiffs and Class Members or otherwise placed them into the stream of commerce.

300.    Plaintiff Simon and the Class Members have privity of contract with Corelle through their purchase of Pyrex, and through the express written and implied warranties that Corelle issued to its customers. Corelle's warranties accompanied Pyrex and were intended to benefit consumers of Pyrex. To the extent Class Members purchased Pyrex from third-party retailers, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Defendants and third-party retailers.

301.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiffs and Class Members bought Pyrex without knowledge of the Defect or the serious safety risks.

302.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiffs and Class Members purchased unsafe Pyrex products that were not fit to be used for their intended purpose of preparing food in a residential setting.

303.    Plaintiff Simon notified Corelle of their breach of the implied warranties shortly after their Pyrex failed to perform as warranted as a result of the Defect.

304.    Upon information and belief, Corelle received further notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting

problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing. Corelle also received notice through Plaintiff Simon who complained to Corelle about the Defect as described above.

305.    Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiffs and Class Members and failed to provide any form of compensation for the damages resulting from the Defect.

306.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiffs and Class Members have suffered damages.

## ELEVENTH CLAIM FOR RELIEF
### Breach of Illinois's Implied Warranty of Merchantability Statute, 810 Ill. Comp. Stat. 5/2-314
### (On behalf of Plaintiff Cashmore and the Illinois Class against Defendants Corelle)

307.    Plaintiffs Cashmore hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

308.    Pyrex purchased by Plaintiffs Cashmore and Class Members was defectively designed and manufactured and posed a serious and immediate safety risk to consumers and the public.

309.    All of Pyrex sold by Corelle left Corelle's facilities and control with a Defect caused by a defective design incorporated into the manufacture of Pyrex.

310.    The Defect placed and/or places Plaintiff and Class Members at risk of injury and/or property damage through the use of Pyrex in their homes.

311.    The law imposes a duty requiring manufacturers or sellers of a product to ensure that the product is merchantable and reasonably fit for the ordinary purposes for which such a product is used, and that the product is acceptable in trade for the product description. This implied

warranty of merchantability is part of the basis of the bargain between Corelle and consumers, including Plaintiff and the Class Members.

312.    Notwithstanding the aforementioned duty, at the time of delivery, Corelle breached the implied warranty of merchantability in that Pyrex is defective and poses a serious safety risk, was not fit for the ordinary purposes for which it was used, would not pass without objection, and failed to conform to the standard performance of like products.

313.    Corelle knew, or should have known, that Pyrex posed a safety risk and was defective, and that it breached the implied warranties at the time it sold Pyrex to Plaintiffs and Class Members or otherwise placed them into the stream of commerce.

314.    Plaintiff Cashmore and the Class Members have privity of contract with Corelle through their purchase of Pyrex, and through the express written and implied warranties that Corelle issued to its customers. Corelle's warranties accompanied Pyrex and were intended to benefit consumers of Pyrex. To the extent Class Members purchased Pyrex from third-party retailers, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Corelle and third-party retailers.

315.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiff and Class Members bought Pyrex without knowledge of the Defect or the serious safety risks.

316.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiff and Class Members purchased unsafe Pyrex products that were not fit to be used for their intended purpose of preparing food in a residential setting.

317.    Upon information and belief, Corelle received notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting problems

with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing.

318.    Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiff and Class Members and failed to provide any form of compensation for the damages resulting from the Defect.

319.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiff and Class Members have suffered damages.

**TWELFTH CLAIM FOR RELIEF**
**Breach of Ohio's Implied Warranty of Merchantability Statute,**
**Ohio Rev. Code Ann. § 1302.27**
**(On behalf of Plaintiff Schutte and the Ohio Class against Defendants Corelle)**

320.    Plaintiff Schutte hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

321.    Pyrex purchased by Plaintiff Schutte and Class Members was defectively designed and manufactured and posed a serious and immediate safety risk to consumers and the public.

322.    All of Pyrex sold by Corelle left Corelle's facilities and control with a Defect caused by a defective design incorporated into the manufacture of Pyrex.

323.    The Defect placed and/or places Plaintiffs and Class Members at risk of injury and/or property damage through the use of Pyrex in their homes.

324.    The law imposes a duty requiring manufacturers or sellers of a product to ensure that the product is merchantable and reasonably fit for the ordinary purposes for which such a product is used, and that the product is acceptable in trade for the product description. This implied warranty of merchantability is part of the basis of the bargain between Corelle and consumers, including Plaintiffs and the Class Members.

325.    Notwithstanding the aforementioned duty, at the time of delivery, Corelle breached the implied warranty of merchantability in that Pyrex is defective and poses a serious safety risk, was not fit for the ordinary purposes for which it was used, would not pass without objection, and failed to conform to the standard performance of like products.

326.    Corelle knew, or should have known, that Pyrex posed a safety risk and was defective, and that it breached the implied warranties at the time it sold Pyrex to Plaintiffs and Class Members or otherwise placed them into the stream of commerce.

327.    Plaintiff Schutte and the Class Members have privity of contract with Corelle through their purchase of Pyrex, and through the express written and implied warranties that Corelle issued to its customers. Corelle's warranties accompanied Pyrex and were intended to benefit consumers of Pyrex. To the extent Class Members purchased Pyrex from third-party retailers, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Defendants and third-party retailers.

328.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiffs and Class Members bought Pyrex without knowledge of the Defect or the serious safety risks.

329.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiffs and Class Members purchased unsafe Pyrex products that were not fit to be used for their intended purpose of preparing food in a residential setting.

330.    Upon information and belief, Corelle received notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing.

331.     Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiffs and Class Members and failed to provide any form of compensation for the damages resulting from the Defect.

332.     As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiffs and Class Members have suffered damages.

### THIRTEENTH CLAIM FOR RELIEF
**Breach of Massachusetts's Implied Warranty of Merchantability Statute,**
**Mass. Gen. Laws ch. 106, § 2-314**
**(On behalf of Plaintiff Klein and the Massachusetts Class against Defendants Corelle)**

333.     Plaintiff Klein hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

334.     Pyrex purchased by Plaintiff Klein and Class Members was defectively designed and manufactured and posed a serious and immediate safety risk to consumers and the public.

335.     All of Pyrex sold by Corelle left Corelle's facilities and control with a Defect caused by a defective design incorporated into the manufacture of Pyrex.

336.     The Defect placed and/or places Plaintiffs and Class Members at risk of injury and/or property damage through the use of Pyrex in their homes.

337.     The law imposes a duty requiring manufacturers or sellers of a product to ensure that the product is merchantable and reasonably fit for the ordinary purposes for which such a product is used, and that the product is acceptable in trade for the product description. This implied warranty of merchantability is part of the basis of the bargain between Corelle and consumers, including Plaintiffs and the Class Members.

338.     Notwithstanding the aforementioned duty, at the time of delivery, Corelle breached the implied warranty of merchantability in that Pyrex is defective and poses a serious safety risk,

was not fit for the ordinary purposes for which it was used, would not pass without objection, and failed to conform to the standard performance of like products.

339.    Corelle knew, or should have known, that Pyrex posed a safety risk and was defective, and that it breached the implied warranties at the time it sold Pyrex to Plaintiffs and Class Members or otherwise placed them into the stream of commerce.

340.    Plaintiff Klein and the Class Members have privity of contract with Corelle through their purchase of Pyrex, and through the express written and implied warranties that Corelle issued to its customers. Corelle's warranties accompanied Pyrex and were intended to benefit consumers of Pyrex. To the extent Class Members purchased Pyrex from third-party retailers, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Defendants and third-party retailers.

341.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiffs and Class Members bought Pyrex without knowledge of the Defect or the serious safety risks.

342.    As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiffs and Class Members purchased unsafe Pyrex products that were not fit to be used for their intended purpose of preparing food in a residential setting.

343.    Upon information and belief, Corelle received notice and has been on notice of the Defect and of its breaches of warranties through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing.

344. Despite having notice and knowledge of the Defect, Corelle failed to provide Defect-free Pyrex to Plaintiffs and Class Members and failed to provide any form of compensation for the damages resulting from the Defect.

345. As a direct and proximate result of Corelle's breach of the implied warranties, Plaintiffs and Class Members have suffered damages.

**FOURTEENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On behalf of Plaintiffs and all Classes against all Defendants)**

346. Plaintiffs hereby re-allege and incorporate all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

347. This alternative claim is asserted on behalf of Plaintiffs and Class Members to the extent there is any determination that any contracts between Class Members and Defendants do not govern the subject matter of the disputes with Defendants, or that Plaintiffs do not have standing to assert any contractual claims against Defendants.

348. Plaintiffs and Class Members conferred a benefit on Defendants, and Defendants had knowledge of this benefit. By its wrongful acts and omissions described herein, including selling the defective Pyrex, Defendants were unjustly enriched at the expense of Plaintiffs and Class Members.

349. Plaintiffs' and Class Members' detriment and Defendants' enrichment were related to and flowed from the wrongful conduct alleged in this Complaint.

350. It would be inequitable for Defendants to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling Pyrex.

351.    Plaintiffs and Class Members seek restitution from Defendants and an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and establishing a constructive trust from which Plaintiffs and Class Members may seek restitution.

### FIFTEENTH CLAIM FOR RELIEF
### Breach of Contract or, alternatively, Common Law Warranty
### (On behalf of all Plaintiffs and all Classes against all Defendants)

352.    Plaintiffs hereby re-allege and incorporate all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

353.    To the extent Defendants' commitment is deemed not to be a warranty under each State's Uniform Commercial Code, Plaintiffs plead in the alternative under common law warranty and contract law.

354.    Plaintiffs and Class Members purchased the Pyrex products either directly from Defendant or through third-party retailers.

355.    Defendant expressly warranted that the Pyrex were fit for their intended purpose in that the Pyrex were fit for normal household cooking.

356.    Defendant made the foregoing express representations and warranties to all consumers, which became the basis of the bargain between Plaintiffs and Class Members and Defendants.

357.    Defendant breached the warranties and/or contract obligation by placing the Pyrex products into the stream of commerce and selling them to consumers, when the Pyrex products are not safe for normal household use and do not have the properties they were represented to possess. Due to the Defect, the Pyrex products are unfit for their intended use and purpose. The Defect substantially and/or completely impairs the use and value of the Products.

358.    The Defect existed when the Pyrex products left Defendants' possession or control and were sold to Plaintiffs and Class Members. The Defect impaired the use and value of the Pyrex products

and were not discoverable by Plaintiffs and Class Members at the time of their purchase of the Pyrex products.

359. As a direct and proximate cause of Defendants' breach of contract, Plaintiffs and Class Members were harmed because they would not have purchased Pyrex products, or, if the products' true nature had been disclosed and mitigated, would have paid significantly less for them.

360. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered damages.

**SIXTEENTH CLAIM FOR RELIEF**
**Violation of New York's Unfair and Deceptive Trade Practices Law,**
**N.Y. Gen. Bus. Law § 349,** *et seq.*
**(On behalf of Plaintiff Fullerton, Plaintiff Slepian,**
**and the New York Class against all Defendants)**

361. Plaintiffs Fullerton and Slepian hereby re-allege and incorporate all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

362. The sale and distribution of Pyrex in New York was a consumer-oriented act and therefore falls under the New York deceptive acts and practices statute, N.Y. Gen. Bus. Law § 349.

363. Defendants violated General Business Law Section 349 by representing that Pyrex products had characteristics, uses, or benefits that they did not have, or that Pyrex products were of a particular standard, quality, or grade that they were not.

364. Defendants' scheme and concealment of the true characteristics of the Defect were material to Plaintiffs and New York Class members, as Defendants intended. Had they known the truth, Plaintiffs and New York Class members would not have purchased Pyrex products, or, if the products' true nature had been disclosed and mitigated, would have paid significantly less for them.

365. Due to the latent nature of the Defect, Plaintiffs Fullerton and Slepian and New York Class members had no way of discerning or otherwise learning that Defendants' representations were false and misleading and that Defendants had concealed or failed to disclose facts relevant to the Defect in their Pyrex products. New York Class members did not, and could not, unravel Defendants' deception on their own.

366. Upon information and belief, Defendants received notice and has been on notice of the Defect through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing.

367. Defendants had an ongoing duty to Plaintiffs and New York Class members to refrain from unfair and deceptive practices under General Business Law Section 349 in the course of their business. Specifically, Defendants owed Plaintiffs and New York Class members a duty to disclose all material facts concerning the Defect because they possessed exclusive knowledge, they intentionally concealed it from Plaintiffs and New York Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

368. Defendants' violations present a continuing risk to Plaintiffs and New York Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

369. As a result of Defendants' statutory violations, Plaintiffs and New York Class members sustained injuries and are entitled to relief under the Act.

**SEVENTEENTH CLAIM FOR RELIEF**
**Violation of New York's False Advertising Law,**
**N.Y. Gen. Bus. Law § 350, *et seq.***
**(On behalf of Plaintiff Fullerton, Plaintiff Slepian,**
**and the New York Class against all Defendants)**

370.     Plaintiffs Fullerton and Slepian hereby re-allege and incorporate all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

371.     Defendants was engaged in the "conduct of business, trade or commerce." N.Y. Gen. Bus. § 350. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

372.     Defendants caused to be made or disseminated through New York—via advertising, marketing, and other publications—statements and omissions that were untrue or misleading to Plaintiffs Fullerton and Slepian and New York Class members.

373.     Defendants made numerous material misrepresentations and omissions of fact with intent to mislead and deceive New York Class members concerning Pyrex, particularly with regard to the Defect. Specifically, Defendants intentionally concealed and suppressed material facts concerning the quality of Pyrex in order to intentionally and grossly defraud and mislead Plaintiffs and New York Class members concerning the Defect.

374.     The misrepresentations and omissions set forth above were material and likely to deceive a reasonable consumer. The inherent Defect was undetectable to the ordinary consumer.

375.     Defendants intentionally and knowingly misrepresented material facts regarding Pyrex with intent to mislead Plaintiffs and New York Class members.

376. Defendants' false advertising was likely to and, in fact, did deceive reasonable consumers including Plaintiffs and New York Class members about the true characteristics of the Defect.

377. Upon information and belief, Defendants received notice and has been on notice of the Defect through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing.

378. Defendants' violations of General Business Law Section 350 present a continuing risk to Plaintiffs and to the general public. Defendants' deceptive acts and practices affect the public interest.

379. Pyrex products do not perform as advertised and make them far less valuable than advertised.

380. Plaintiffs and New York Class members who purchased Pyrex either would not have purchased the Glassware at all or else paid less for Pyrex but for Defendants' false advertising in violation of General Business Law Section 350.

381. Plaintiffs and New York Class members have suffered injury-in-fact and/or actual damages and ascertainable loss as a direct and proximate result of Defendants' false advertising in violation of General Business Law Section 350, including, but not limited to, purchasing or leasing a diminished value or complete lost value for Pyrex purchased or leased.

382. Plaintiffs and New York Class members have suffered lost or diminished use, enjoyment, and utility of their Pyrex along with suffering annoyance, aggravation, and inconvenience resulting from Defendants' violations of General Business Law Section 350.

383.    Plaintiffs and New York Class members seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500.00 each for New York Class member. N.Y. Gen. Bus. Law § 350-e. Because Defendants' conduct was committed willingly and knowingly, Plaintiff and New York Class Members are entitled to recover three times actual damages, up to $10,000.00.

384.    Plaintiffs and New York Class Members also seek an order enjoining Defendants' false advertising and further seeks attorneys' fees and any other just and proper relief under General Business Law Section 350.

### EIGHTEENTH CLAIM FOR RELIEF
**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),**
**Fla. Stat. Ann. § 501.201,** *et seq.*
**(On Behalf of Plaintiff Grau and the Florida Class against all Defendants)**

385.    Plaintiff Grau hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

386.    FDUTPA states in pertinent part that "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. Ann. § 501.204(1).

387.    Defendants engaged in unfair and deceptive acts in violation of FDUTPA, Fla. Stat. Ann. § 501.204, when Defendants failed to disclose that their Pyrex demonstrated inadequate thermal shock resistance for use in cooking and baking and that their Pyrex was susceptible to shattering when exposed to temperature changes commonly experienced when removing glassware from an oven. Defendants further engaged in unfair and deceptive acts for purposes of FDUTPA when, in response to requests for replacement products after a shattering event, they responded by simply referring Pyrex owners to care and use instructions and implying that owners were at fault.

388.    Upon information and belief, Defendants received notice and has been on notice of the Defect through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing.

389.    Plaintiff Grau and Florida Class members relied on Defendants' misrepresentations when purchasing their Pyrex. Had they known that those representations were false, she and class members would not have purchased Pyrex, or else would have paid significantly less for the Pyrex.

390.    Plaintiffs and the class seek all damages permitted by law in an amount to be determined at trial.

### NINETEENTH CLAIM FOR RELIEF
**Violation of Michigan's Consumer Protection Act,**
**Mich. Comp. Laws § 445.901,** *et seq.*
**(On behalf of Plaintiff Simon and the Michigan Class against all Defendants)**

391.    Plaintiff Simon hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

392.    Plaintiff Simon, the Michigan Class members, and Defendants are persons as defined by Michigan's Consumer Protection Act. Mich. Comp. Laws § 445.902(d).

393.    Defendants engaged in trade or commerce as defined by Michigan's Consumer Protection Act by advertising, providing, offering, or distributing Pyrex in the State of Michigan. Mich. Comp. Laws § 445.902(g).

394.    Defendants' scheme to conceal the true characteristics of the Defect was material to Plaintiffs and Michigan Class members, as Defendants intended. Had they known the truth, Plaintiffs and Michigan Class members would not have purchased Pyrex products, or, if the products' true nature had been disclosed and mitigated, would have paid significantly less for them.

395.    Due to the latent nature of the Defect, Plaintiff Simon and the Michigan Class members had no way of discerning or otherwise learning that Defendants' representations were false and misleading and that Defendants had concealed or failed to disclose facts relevant to the Defect in their Pyrex products. Michigan Class members did not, and could not, unravel Defendants' deception on their own.

396.    Upon information and belief, Defendants received notice and has been on notice of the Defect through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing.

397.    Defendants' violations present a continuing risk to Plaintiff and Michigan Class members, as well as to the general public. Defendants' unfair, unconscionable, or deceptive methods, acts, or practices complained of herein affect the public interest.

398.    As a result of Defendants' conduct, Plaintiff and the Michigan Class members were harmed and suffered actual damages as a result of Defendants' unfair, unconscionable, or deceptive methods, acts, or practices. Had Defendants disclosed the Defect to consumers, Plaintiff and the Michigan Class members would not have purchased the Pyrex products, or else would have paid significantly less for them.

399.    As a result of Defendants' statutory violations, Plaintiff and the Michigan Class members sustained injuries and are entitled to relief under the Act.

400.    Plaintiff and the Michigan Class members seek damages, as well as declarative and injunctive relief prohibiting Defendants from continuing these unlawful practices, pursuant to Mich. Comp. Laws § 445.911.

401.    Plaintiff and the Michigan Class members seek an award for the actual damages caused by Defendants' unfair, unconscionable, or deceptive methods, acts, or practices and any other relief the Court deems appropriate.

## TWENTIETH CLAIM FOR RELIEF
**Violation of Illinois's Consumer Fraud and Deceptive Trade Practices Act ("Illinois CFA"), 815 Ill. Comp. Stat. 505/1, *et seq.***
**(On behalf of Plaintiff Cashmore and the Illinois Class against all Defendants)**

402.    Plaintiff Cashmore hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

403.    At all times material, Illinois's Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.*, was in full force and effect.

404.    Plaintiff Cashmore and Illinois Class Members may sue as consumers within the meaning of the Illinois CFA because Defendants' business activities involve trade or commerce, are addressed to the market generally, and otherwise implicate consumer protection concerns.

405.    The Illinois CFA renders unlawful the "use or employment of any deception [including the] concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct or any trade or commerce." 815 Ill. Comp. Stat. 505/2.

406.    When Defendants designed, developed, manufactured, licensed, marketed, and sold the products, it was involved in the conduct of trade and commerce under the Illinois CFA.

407.    At the time Defendants developed, manufactured, licensed, marketed, and sold Pyrex, it knew that the Pyrex products contained the Defect, which poses serious safety risks to consumers, including Plaintiff and Illinois Class members.

408. Nevertheless, Defendants concealed their knowledge of the Defect from consumers and instead sold Pyrex while remaining silent as to the change in materials from borosilicate glass to soda lime glass.

409. Defendants' intentional misrepresentations, omissions, and concealments of material fact constitute unfair and/or deceptive practices in violation of the Illinois CFA.

410. Defendants violated the Illinois CFA when they sold Pyrex without disclosing the change in materials from borosilicate glass to soda lime glass and the resulting inferiority and dangers.

411. Defendants violated the Illinois CFA when they sold a product that they knew was defective and held out to the public that Pyrex was composed of the same materials from which it had always been manufactured.

412. Defendants' deceptive practices, including, but not limited to, licensing and marketing of the product were designed to induce Plaintiff and Illinois Class members to purchase Pyrex containing the Defect and to avoid a potential decrease in sales as a result of the significant decrease in resistance to temperature change that Pyrex has touted for nearly a century.

413. Plaintiff and Illinois Class Members suffered injury-in-fact as a direct result of Defendants' violations of the Illinois CFA in that they have paid for Pyrex that is inferior and poses an immediate safety risk.

414. Had Defendants disclosed the true quality and defective nature of Pyrex, Plaintiffs and Illinois Class members would not have purchased Pyrex, or else would have paid substantially less for it.

415.    Plaintiff and Illinois Class members have also been denied the use of their Pyrex, expended money on replacements, have been damaged, and have suffered as a result of Defendants' conduct.

416.    To this day, Defendants continues to violate the Illinois CFA by concealing the defective nature of Pyrex by failing to issue a recall, by failing to notify customers of the serious safety issues posed by the defective Pyrex, and by failing to offer replacements of their defective Pyrex to consumers.

417.    As a direct and proximate result of Defendants' unfair acts or practices alleged herein, Plaintiff and Illinois Class members were damaged.

### TWENTY-FIRST CLAIM FOR RELIEF
**Violation of Illinois's Uniform Deceptive Trade Practices Act ("Illinois UDTPA"),**
**815 Ill. Comp. Stat. 510/1, *et seq.***
**(On behalf of Plaintiff Cashmore and the Illinois Class against all Defendants)**

418.    Plaintiff Cashmore hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

419.    At all times material, Illinois's Uniform Deceptive Trade Practices Act, 815 Ill Comp. Stat. 510/1, *et seq.*, was in full force and effect.

420.    The Illinois UDTPA provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: ". . . (5) represents that goods or services have . . . uses, benefits, or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." 815 Ill. Comp. Stat. 510/2.

421.    Defendants are "persons" within the meaning of 815 Ill. Comp. Stat. 510/1(5).

422.     Defendants' actions, as alleged herein, constitute deceptive, unfair, fraudulent, and unlawful practices committed in violation of the Illinois UDTPA.

423.     All of the conduct and misrepresentations alleged herein occurred in the course of Defendants' business and was part of a pattern or generalized course of conduct.

424.     As described more fully above, Defendants knew of the Defect and that Pyrex posed a serious safety risk to Plaintiff and Illinois Class members. Defendants concealed that knowledge and misrepresented to consumers and the public that its Pyrex is durable and safe for normal use.

425.     Despite its knowledge of the serious safety risk Pyrex posed to consumers, Defendants failed to issue a warning or to recall and/or replace Pyrex and instead concealed the Defect and the safety issues with Pyrex for years, which continues to this day.

426.     As an entity with exclusive knowledge regarding the safety risk and Defect in Pyrex, Defendants had a duty to disclose the existence of any defect, particularly in light of the fact that Pyrex posed a serious safety risk to Plaintiff and Illinois Class members.

427.     Plaintiff and Illinois Class members reasonably expected that Defendants would disclose the existence of the Defect and the serious safety risk Pyrex posed to consumers and the public, information which is and was material to Plaintiff and Illinois Class members. Plaintiff and Illinois Class members also reasonably expected that Defendants would not sell a product that was unsafe to use.

428.     Defendants, at all times material, knew or should have known that Plaintiff and Illinois Class Members did not know of, nor could reasonably have been expected to discover, the safety risk posed by the Pyrex and that Defendants was in exclusive possession of the knowledge of the Defect.

429. By concealing the serious safety risk posed by Pyrex products and the existence of the Defect and representing that soda lime Pyrex had the same thermal shock resistance as its borosilicate predecessor, Defendants engaged in actionable conduct within the meaning of the Illinois UDTPA.

430. Had Plaintiff and Illinois Class members known of the serious safety risk and/or the Defect in Pyrex, they would not have purchased Pyrex, or else would have paid substantially less for it.

431. Defendants' deceptive, unfair, fraudulent, and unlawful conduct alleged herein was specifically designed to and did induce Plaintiff and Illinois Class Members to purchase Pyrex.

432. Plaintiff and Illinois Class Members suffered injury and/or damage to real or personal property as a result of their purchases and thus Plaintiff Cashmore has standing to represent the Illinois Class in this action.

433. As a direct and proximate result of Defendants' violation of the Illinois UDTPA alleged herein, Plaintiff and Illinois Class members were damaged.

434. Plaintiff and Illinois Class members seek injunctive relief, pursuant to 815 Ill. Comp. Stat. 510/3, against Defendants based upon the vast market share that Defendants claims to have for Pyrex and the extremely high likelihood that Plaintiff and Illinois Class members may personally suffer future damages from the failure of Defendants' Pyrex.

**TWENTY-SECOND CLAIM FOR RELIEF**
**Violation of Ohio's Consumer Sales Practices Act ("Ohio CSPA"),**
**Ohio Rev. Code § 1345.01, *et seq.***
**(On Behalf of Plaintiff Schutte and the Ohio Class against all Defendants)**

435. Plaintiff Schutte hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

436. Plaintiff and the Ohio Class members are "consumers" within the meaning of the

Ohio CSPA, Ohio Rev. Code Ann. § 1345.01(D).

437.     Defendants are "suppliers" as defined by Ohio Revised Code §1345.01(C).

438.     Defendants' conduct described herein involves "consumer transactions" as defined in Ohio Rev. Code § 1345.01(A).

439.     Defendants have engaged in unfair and deceptive trade practices in connection with a consumer transaction, including representing that Pyrex products have characteristics, uses, benefits, and qualities that they do not have; representing that Pyrex products are of a particular standard and quality when they are not; advertising Pyrex products with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

440.     Defendants' misrepresentations and false, deceptive, and misleading statements with respect to Pyrex, as described herein, constitute deceptive acts or practices under the Ohio CSPA.

441.     Defendants' false, unfair, deceptive, and unconscionable acts have previously been declared or otherwise found to be false, unfair, deceptive, or unconscionable under the laws of the State of Ohio.

442.     It is a deceptive act or practice for purposes of the Ohio CSPA if a supplier makes representations, claims, or assertions of fact in the absence of a reasonable basis in fact, as Ohio Admin. Code § 109:4-3-10(A) specifically proscribes such statements:

> Make any representations, claims or assertions of fact, whether orally or in writing, which would cause a reasonable consumer to believe such statements are true, unless, at the time such representations, claims or assertions are made, the supplier possesses or relies upon a reasonable basis in fact such as factual, objective, quantifiable, clinical or scientific data or other competent and reliable evidence which substantiates such representations, claims or assertions of fact.

443.     As a result of their misrepresentations and false, deceptive, and misleading

statements with respect to Pyrex, as described herein, Defendants have violated the Ohio CSPA, Ohio Rev. Code §1345.02.

444.    As a direct and proximate result of Defendant's violation of the Ohio CSPA, Ohio Rev. Code § 1345.02, Plaintiff and the Ohio Class members have suffered damages, the full amount of which will be proven at trial.

445.    Plaintiff and Ohio Class members are entitled to rescind the consumer transactions or recover actual damages, plus an amount not exceeding $5,000 in non-economic damages, pursuant to Ohio Rev. Code §1345.09(A).

446.    Plaintiff and Ohio Class Members seek an order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement, pursuant to Ohio Rev. Code §1345.09(E).

447.    Plaintiff, individually and on behalf of the other Ohio Class members, seeks damages and attorneys' fees and costs, pursuant to Ohio Rev. Code §1345.09(F).

448.    This Complaint will be served upon the Ohio Attorney General, pursuant to Ohio Rev. Code § 1345.09(E).

### TWENTY-THIRD CLAIM FOR RELIEF
**Violation of Ohio's Deceptive Trade Practices Act ("Ohio DTPA"),**
**Ohio Rev. Code § 4165,** *et seq.*
**(On Behalf of Plaintiff Schutte and the Ohio Class against all Defendants)**

449.    Plaintiff Schutte hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein

450.    Defendants are "persons" as defined in Ohio Rev. Code § 4165.01(D).

451.    In violation of Ohio Rev. Code § 4165.02(A), Defendants have engaged in a deceptive trade practice by using deceptive representations in connection with goods; representing that goods have sponsorship, approval, characteristics, uses or benefits that they do not have;

representing that goods are of a particular standard, quality, or grade when they are of another; and advertising goods with intent not to sell them as advertised.

452.     As a result of their deceptive trade practices with respect to Pyrex products, Defendants have violated the Ohio DTPA, Ohio Rev. Code § 4165.02(A).

453.     Defendants' violations of Ohio DTPA have caused Plaintiff and Class Members actual damages.

454.     Plaintiff and the Ohio Class members seek damages, as well as declarative and injunctive relief prohibiting Defendants from continuing to engage in deceptive trade practices, as described herein.

455.     Plaintiff and the Ohio Class members seek an award for the actual damages caused by Defendants' deceptive trade practices, attorneys' fees and costs, and any other relief the Court deems appropriate.

### TWENTY-FOURTH CLAIM FOR RELIEF
**Violation of Massachusetts's Consumer Protection Law**
**Mass. Gen. Laws ch. 93A, §1, *et seq.***
**(On behalf of Plaintiff Klein and the Massachusetts Class against All Defendants)**

456.     Plaintiff Klein hereby re-alleges and incorporates all allegations raised in Paragraphs 1 through 134 into this cause of action and claim for relief as if fully set forth herein.

457.     Plaintiff Klein, the Massachusetts Class members, and Defendants are "persons" as defined by Mass. Gen. Laws ch. 93A, §1(a).

458.     The Massachusetts consumer protection law prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2.

459.     Defendants engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

460.     Defendants scheme to conceal that Pyrex products contained the Defect and that the Defect posed a safety risk to consumers, including Plaintiff and the Massachusetts Class members. If the true nature of the Pyrex products had been disclosed and mitigated, Plaintiff and the Massachusetts Class members would not have purchased Pyrex, or else would have paid significantly less for it.

461.     Due to the latent nature of the Defect, Plaintiff Klein and the Massachusetts Class members had no way of discovering or otherwise learning that Defendants' representations were false and misleading and that Defendants had concealed or failed to disclose facts relevant to the Defect in their Pyrex products. Plaintiff and Massachusetts Class members did not, and could not, unravel Defendants' deception on their own.

462.     Upon information and belief, Defendants received notice and has been on notice of the Defect through customer warranty claims reporting problems with Pyrex, consumer complaints at various sources, numerous lawsuits filed against it over failures of Pyrex, and its own internal and external testing.

463.     Defendants' violations present a continuing risk to consumers, including Plaintiff and Massachusetts Class members. Defendants' unfair, unconscionable, or deceptive methods, acts, or practices complained of herein affect the public interest.

464.     As a result of Defendants' conduct, Plaintiff and the Massachusetts Class members were harmed and suffered actual damages as a result of Defendants' unfair, unconscionable, or deceptive methods, acts, or practices. Had Defendants disclosed the Defect to consumers, Plaintiff and the Massachusetts Class members would not have purchased the Pyrex products, or else would have paid significantly less for them.

465. Pursuant to Mass. Gen. Laws ch. 93A, §9, Plaintiff and the Massachusetts Class members seek monetary relief measured as the greater of (a) actual damages in the amount to be determined at trial and (b) statutory damages in the amount of $25 per plaintiff. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs is entitled to recover up to three times actual damages, but no less than two times actual damages.

466. Plaintiff and the Massachusetts Class Members seek an award for the actual damages caused by Defendants' unfair, unconscionable, or deceptive practices; punitive damages; attorney's fees and costs; and any other relief the Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following judgment:

A. An Order certifying this action as a class action on behalf of the Nationwide Class and the State Classes;

B. An Order appointing Plaintiffs as Class representatives, and appointing the undersigned counsel as Class Counsel;

C. A Declaration that Pyrex is defective;

D. An Order awarding injunctive relief by requiring Defendants, at their own expense, to issue corrective actions, including notification, recall, inspection, and, as necessary, replacement of Pyrex;

E. Payment to Plaintiffs and all Class Members of all damages associated with or caused by the defective Pyrex products, in an amount to be proven at trial;

F. An award of attorneys' fees and costs, as provided by law and/or as would be reasonable from any recovery of monies recovered for or benefits bestowed on the Class;

G.       Interest as provided by law, including, but not limited to, pre-judgment and post-

judgment interest as provided by rule or statute; and

H.       Such other and further relief as this Court may deem just, equitable, or proper.

## JURY TRIAL DEMAND

Plaintiffs respectfully request a trial by jury on all causes of action so triable.


Dated: September 6, 2018                              **RESPECTFULLY SUBMITTED,**


s/*Gregory F. Coleman*                              s/*Nyran Rose Rasche*
Gregory F. Coleman, TN Bar #014092          Nyran Rose Rasche
*Member of the Trial Bar, N.D. Illinois*         Brian P. O'Connell
Adam A. Edwards*                                   **CAFFERTY CLOBES MERIWETHER &**
Mark E. Silvey*                                         **SPRENGEL LLP**
**GREG COLEMAN LAW PC**                        150 South Wacker Street
800 S. Gay Street, Suite 1100                     Suite 3000
Knoxville, Tennessee 37929                       Chicago, Illinois 60606
Telephone: (865) 247-0080                        Telephone: (312) 782-4880
Facsimile: (865) 522-0049                         Facsimile: (312) 782-4485
greg@gregcolemanlaw.com                       nrasche@caffertyclobes.com
adam@gregcolemanlaw.com                      boconnell@caffertyclobes.com
mark@gregcolemanlaw.com


Edward A. Wallace                                    Bryan L. Clobes
**WEXLER WALLACE LLP**                           **CAFFERTY CLOBES MERIWETHER &**
55 W. Monroe Street, Suite 3300               **SPRENGEL LLP**
Chicago, Illinois 60603                            1101 Market Street,
Telephone: (312) 346-2222                        Suite 2650
Facsimile:  (312) 346-0022                        Philadelphia, Pennsylvania 19107
eaw@wexlerwallace.com                           Telephone: (215) 864-2800
                                                        bclobes@caffertyclobes.com


Paul C. Peel (*pro hac vice* to be filed)        Joseph G. Sauder
**FARRIS BOBANGO PLC**                          Matthew D. Schelkopf
999 S. Shady Grove Road, Suite 500           Joseph B. Kenney
Memphis, Tennessee 38120                       **SAUDER SCHELKOPF LLC**
Telephone: (901) 259-7100                        555 Lancaster Avenue
Facsimile: (901) 259-7150                         Berwyn, Pennsylvania 19312
ppeel@farris-law.com                               Telephone: 888.711.9975
                                                        Facsimile:  610.727.4360

Daniel K. Bryson*                              jgs@sstriallawyers.com
Harper T. Segui*                               mds@sstriallawyers.com
Patrick M. Wallace (*pro hac vice* to be filed)   jbk@sstriallawyers.com
**WHITFIELD BRYSON & MASON LLP**
900 W. Morgan Street
Raleigh, North Carolina 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
dan@wbmllp.com
pat@wbmllp.com

*\*admitted pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed using this Court's CM/ECF service,

which will send notification of such filing to all counsel of record in Case Nos.  1:18-cv-4152 and

1:18-cv-4198 on this 6th day of September, 2018.

*s/Gregory F. Coleman*
Gregory F. Coleman
GREG COLEMAN LAW PC